UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MEAG MUNICH ERGO KAPITALANLAGEGESELLSCHAFT MBH and MEAG MUNICH ERGO ASSETMANAGEMENT GMBH, | : : : : |
|  | : |
| Plaintiffs, | : : |
| -against- | : : |
| VIVENDI, S.A., JEAN-MARIE MESSIER and GUILLAUME HANNEZO, | : : : |
| Defendants. | : : |

No.  07-cv-11485

ECF CASE

JURY TRIAL DEMANDED

# <u>COMPLAINT</u>

**GRANT & EISENHOFER P.A.**
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
Diane Zilka (DZ-9452)
Christine M. Mackintosh
485 Lexington Avenue
29th Floor
New York, NY  10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501

**DIAZ REUS ROLFF & TARG LLP**
Alexander Reus (AR-4674)
100 SE Second Street, Suite 2610
Miami, FL 33131
Telephone:    (786) 235-5000
Facsimile:    (786) 235-5005

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ...................................................................2

II.  JURISDICTION AND VENUE ...........................................................5

III.  PARTIES ........................................................................................11

IV.  MESSIER EMBARKS ON AN AGRRESSIVE PLAN TO TRANSFORM
VIVENDI INTO AN INTERNATIONAL CONGLOMERATE, PUTTING IT IN
A PERILOUS FINANCIAL CONDITION.............................................15

V.  DEFENDANTS' FRAUDULENT SCHEME ......................................19

    A.  The Genesis Of Vivendi's Fraudulent Scheme.................................19

    B.  Vivendi Uses Improper Accounting To Shore Up Its Stock Prices...................19

        1.  Accounting Rules Applicable To Foreign Issuers Of Securities ......................19

        2.  Vivendi's Improper Balance Sheet Consolidations ...........................................21

        3.  Vivendi's Improper Failure To Write Down Impaired Goodwill.....................25

            a.  Canal+..........................................................................................25

            b.  U.S. Filter.....................................................................................28

        4.  Vivendi's Improper Recognition of Revenue On U.S. Filter ...........................29

        5.  Vivendi's Improper Inflation Of Canal+'s Assets ...........................................30

        6.  Vivendi's Improper EBITDA Manipulation.......................................................32

        7.  Vivendi's Failure To Report Pro Forma Metrics Properly ...............................35

        8.  Vivendi's Failure To Disclose Its 2% Indirect Interest In Elektrim
Telekomunikacja.............................................................................................36

        9.  Vivendi Violated The Terms Of Its Own Publicly-Disclosed
Accounting Policies .......................................................................................37

    C.  Vivendi Conceals A Growing Liquidity Crisis.................................................39

        1.  Vivendi Fails To Disclose It Inability To Generate Expected Cash
Flows From Its Costly Acquisitions ..............................................................40

        2.  Vivendi Fails To Disclose The Insufficiency Of Its Working Capital .............40

        3.  Vivendi Fails To Disclose Acceleration Clauses In Its Loans.........................41

4.    Vivendi Fails To Disclose Its Narrow Avoidance Of A December 2001 Credit Downgrade .................................................................................41

5.    Vivendi Fails To Disclose Material Commitments Concerning Cegetel...........42

VI.    VIVENDI'S FALSE AND MISLEADING STATEMENTS.................................44

VII.    THE TRUTH EMERGES, CAUSING PLAINTIFFS TO INCUR LOSSES ..................90

VIII.    DEFENDANTS' SCIENTER.................................................................99

IX.    LOSS CAUSATION.........................................................................105

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................108

XI.    PRESUMPTION OF RELIANCE.........................................................109

XII.    TOLLING OF THE STATUTE OF LIMITATIONS....................................110

XIII.    CLAIMS FOR RELIEF .....................................................................111

FIRST CLAIM FOR RELIEF Violation of Section 10(b) of the Exchange Act and Subsections (a), (b) and (c) of Rule 10b-5 Promulgated Thereunder (Against All Defendants)..................................................................................111

SECOND CLAIM FOR RELIEF Violation of Section 18 of the Exchange Act (Against All Defendants)..................................................................................113

THIRD CLAIM FOR RELIEF Violation of Section 20(a) of the Exchange Act (Against Defendants Messier and Hannezo) ......................................................114

FOURTH CLAIM FOR RELIEF Common Law Fraud (Against All Defendants)...................115

FIFTH CLAIM FOR RELIEF Common Law Negligent Misrepresentation (Against All Defendants)..................................................................................117

SIXTH CLAIM FOR RELIEF Unjust Enrichment (Against All Defendants)...........................118

XIV.    PRAYER FOR RELIEF .....................................................................119

XV.    JURY TRIAL DEMANDED.................................................................120

1.    Plaintiffs MEAG MUNICH ERGO Kapitalanlagegesellschaft mbH and MEAG

MUNICH ERGO AssetManagement GmbH (collectively, "MEAG" or "Plaintiffs"), by their

undersigned attorneys, allege the following upon personal knowledge as to themselves and their

own acts and upon information and belief as to all other matters.  Plaintiffs' information and

belief is based on their investigation (made by and through their attorneys), which investigation

included, among other things, a review and analysis of (1) filings by Vivendi Universal, S.A.

(now known as Vivendi, S.A. and referred to hereinafter as "Vivendi" or "the Company") with

the Securities and Exchange Commission ("SEC") and the Commission des Operations des

Bourse ("COB") (now part of the Autorité des marchés financiers), the French equivalent of the

SEC; (2) press releases published by Vivendi; (3) analyst reports concerning Vivendi; (4) public

statements by or on behalf of Vivendi and the other Defendants; (5) pleadings in litigation

naming Vivendi as a defendant, including *In re Vivendi Universal, S.A. Securities Litigation*, No.

02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class Action") and *Securities and Exchange

Commission v. Vivendi Universal, S.A., Jean-Marie Messier and Guillaume Hannezo*, Case No.

03-CIV-10195 (PKC) (S.D.N.Y.); (6) documents and information concerning the Defendants

filed with or on record with criminal, civil and regulatory authorities in the United States and in

France; and (7) newspaper and  magazine articles (and other media coverage) regarding Vivendi,

its business, and/or the other Defendants.  Many of the facts supporting the allegations contained

herein are known only to the Defendants or are exclusively within their custody and/or control.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this

Complaint after a reasonable opportunity for discovery.

2.    Plaintiffs bring this action against Vivendi, its former Chief Executive Officer and

Chairman, Jean-Marie Messier ("Messier"), and its former Chief Financial Officer, Guillaume

Hannezo ("Hannezo"). As a result of the fraud, inequitable acts and/or negligence alleged herein, between October 30, 2000 and August 14, 2002 inclusive (the "Loss Period"), Plaintiffs suffered significant losses in connection with their purchases of Vivendi's common shares that traded on the EuroNext Paris, S.A. (the "Paris Bourse").

## I.  NATURE OF THE ACTION

3.    This action involves the greed and hubris that led Messier, an ambitious former investment banker, to attempt to transform a centuries-old French water utility company into an international media and telecommunications conglomerate. Unfortunately for the Company's shareholders, in pursuit of this transformation, Messier and his fellow Defendants created a liquidity crisis for Vivendi and then proceeded to engage in a cover-up of that crisis using improper accounting practices and materially false and misleading statements. Ultimately, after Messier was forced out of Vivendi and the truth about Defendants' activities emerged, Vivendi's securities lost over 80% of their market value.

4.    The entity now known as Vivendi was created over 150 years ago as a water company. It maintained that focus until the late 1970's, when Messier's predecessor began expanding and diversifying the Company. Messier, who was named to the Company's top office in 1996, continued the expansion trend. He did so at a faster and more furious pace, with the grand objective of building a multinational media conglomerate. During Messier's reign, Vivendi spent tens of billions of dollars to acquire dozens of companies in the United States and elsewhere.

5.    Messier's appetite for acquisitions caused the Company to incur massive debt. By the time Messier was ousted, Vivendi carried the biggest debt load in French corporate history.

6.    In order to service the enormous debt created by this acquisition spree, Vivendi needed to maintain the Company's favorable credit ratings and strong stock price - even in the

face of an economic downturn and faltering performance in the Company's core business sectors. To that end, Defendants tried to hide problems associated with Vivendi's acquisitions and investments by (a) fraudulently assuring investors that Vivendi had sufficient cash flow to manage its debts and (b) manipulating the Company's financial reports.

7.    During the Loss Period, and as a result of the acquisition spree, the Company's massive debt resulted in a cash flow crunch that (unknown to investors at the time) threatened to imperil the Company's very existence. As reported in The Wall Street Journal, during the Loss Period Vivendi in fact only narrowly avoided a credit downgrade, "which would have . . . plunged the company into a cash crisis." In response to this imminent peril, Hannezo wrote to Messier, "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat" and "All I ask is that all of this not end in shame." John Carreyrou and Martin Peers, *Damage Control: How Messier Kept Cash Crisis At Vivendi Hidden for Months — Media Giant Was At Risk Well Before Investors Knew,* The Wall Street Journal, Oct. 31, 2002, at A1.

8.    Despite the perilous cash flow situation facing the Company as a result of its acquisitions, Defendants issued rosy statements about Vivendi's financial health. As discussed in detail below, Defendants repeatedly represented that Vivendi was in the best of financial health and at one point during the Loss Period even represented that "pro forma net debt [was] practically non-existent." Defendants made other positive statements regarding Vivendi's robust financial position in presentations to market analysts, press releases, annual reports, filings with the SEC and in other public media.

9.    In addition to misleading the investing public about the Company's imminent liquidity crisis, Defendants improperly manipulated the Company's accounting in order to shore

up its financial reports. To that end, Defendants, among other things, (1) improperly consolidated into Vivendi's financial reports the results of companies in which Vivendi possessed less than 50% ownership, (2) improperly delayed the write down of impaired goodwill on acquisitions, (3) improperly recognized revenue, (4) improperly inflated assets, (5) improperly manipulated earnings and (6) violated its own accounting pronouncements. As set forth in detail below, the improper accounting rendered the Company's historical financial statements and balance sheets published during the Loss Period, as well as other public filings concerning Vivendi, materially false and misleading.

10. Having staved off the inevitable through manipulation and deception, eventually the weight of the lies collapsed Defendants' scheme. In June 2002, an immediate and severe cash shortage threatened the Company's continued viability. Over the course of the next several weeks, the truth about Defendants' deception was revealed.

11. On July 3, 2002, Vivendi's board ousted Messier. Thereafter, the Company's new management was forced to disclose that Vivendi would immediately have to secure both bridge and long-term financing to avoid default on its largest credit obligations. During a hearing before the French Parliament in September 2002, Vivendi's new chairman admitted that had Messier remained Vivendi's CEO beyond July 3, 2002, the Company undoubtedly would have gone bankrupt "within 10 days."

12. While Messier may have succeeded in transforming Vivendi into a multinational conglomerate, the Company—and ultimately its shareholders—would come to pay an unacceptably high price for Messier's unchecked ambition. Among other things, Defendants' actions resulted in (1) a crippling drop in the prices of Vivendi's common shares on the Paris Bourse and its American Depository Shares ("ADSs") on the New York Stock Exchange

("NYSE"), (2) the Company's de-listing from the NYSE, (3) an onslaught of civil litigation and (4) the imposition of a massive civil fine by the SEC.

13.  The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of the Company's securities.  The Company's ADSs lost 85% of their value from their Loss Period high of $75.50 and its common shares declined 83.9% from their Loss Period high of €86.50.  These declines resulted in significant damage to the Company's shareholders, including Plaintiffs.

## II.  JURISDICTION AND VENUE

14.  The claims herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and common law.

15.  In connection with the acts and course of conduct alleged in this Complaint, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

16.  This Court has jurisdiction over this matter and over the Defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. §§ 1331 and 1337(a); and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

17.  Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c) and (d).  Offers and sales of Vivendi securities at issue in this action occurred in this District.  In addition, many of the acts and practices made in furtherance of Defendants' fraudulent scheme and complained of herein occurred in substantial part and/or had an effect in this District, including the creation and implementation of the manipulative devices and contrivances.  Further, Vivendi, Messier and Hannezo were located in,

conduct (or conducted) substantial business in, and/or have (or had) substantial contacts with this District.

18.    Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over Plaintiffs' claims because the Defendants' improper conduct had an impact upon the NYSE, the United States market which was fully integrated with the market on which Plaintiffs purchased common shares. Defendants' improper conduct, including that which was carried out in the United States, artificially inflated the price of the Company's securities and affected the integrity of the prices paid for Vivendi securities in the United States and on foreign exchanges.

19.    This Court may also properly exercise subject matter jurisdiction under the "conduct test," articulated by the Second Circuit and other courts, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" the plaintiff's losses. The facts alleged herein show that the substantial activity in furtherance of Defendants' fraud that occurred within the United States was instrumental in causing Plaintiffs' losses.

20.    In the United States, Vivendi sold securities whose prices were artificially inflated by means of false and misleading statements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and press releases. Vivendi actively marketed and sold these securities in the United States despite its false reporting of its financial condition as alleged herein. Many, if not most, of its press releases shared a New York dateline.

21.    Throughout the Loss Period, Vivendi regularly filed Forms 20-F and 6-K with the SEC that contained materially false and misleading information, as described in detail herein.

22.    Further, Vivendi organized meetings, including ones in New York, with the financial community, including with Wall Street analysts, to review reported financial results. As alleged herein, Defendants issued false statements at those meetings.

23.    Defendants also engaged in extensive activities in the United States to further their fraud and Vivendi's fraudulent scheme as alleged herein was centralized in large part in this District, where Messier and Hannezo orchestrated the fraud. As described in detail herein, a primary objective of Vivendi's expansion plan during the late 1990s through July 2002 was to expand into the United States by acquiring businesses. To do so, however, Vivendi had to go to the financial markets to raise the money needed for its acquisition strategy. Vivendi used its securities – both ADSs and common shares – and borrowed cash against future earnings to purchase substantial equity positions in a number of United States companies. Defendants perpetrated their fraudulent scheme and course of conduct by using Vivendi's falsified financial statements to raise billions of dollars of new capital in the United States and elsewhere, while making false statements about Vivendi's financial condition and prospects in order to inflate the value of the shares it would use as consideration for its numerous acquisitions. By these fraudulent means, Vivendi was able to acquire and conduct significant operations and activities in the United States.

24.    Vivendi was formed as a result of a 2000 merger among Vivendi, S.A.; Seagram Company Ltd. ("Seagram"), which owned the United States company Universal Studios; and Canal Plus, S.A. (the "Merger"). Before and throughout the Loss Period, Vivendi purchased such United States companies as Aqua Alliance Inc.; EMusic.com; Houghton Mifflin Co.; MP3.com; Prize Central Networks, Inc.; RMM Records & Video; Superior Services, Inc.; the

StayWell Company, Ltd.; Uproar, Inc.; U.S. Filter; and the entertainment assets of USA Network.

25.  According to a Vivendi press release dated February 16, 2001, the percentage of its securities owned by United States shareholders had more than doubled over a 12-month period, demonstrating that the Company was truly "international."

26.  During the Loss Period, Vivendi maintained offices in New York.  In September 2001, Messier and Hannezo moved to New York to obtain better direct corporate operations and to more effectively promote misleading perceptions on Wall Street, as described in detail herein.

27.  On October 5, 2001, Vivendi further boosted its presence in the United States capital markets when ADSs of Vivendi Environnement, Vivendi's environmental operations subsidiary, began trading on the NYSE.  That day, Messier (who was also a member of the NYSE Board) publicly explained the benefit of the listing:  "Today's listing gives Vivendi Environnement's shares the visibility, credibility, and security that the prestigious New York Stock Exchange can provide," describing New York as the "prestigious financial center."  Henri Proglio, Chairman of Vivendi Environnement's Management Board, also stated that day that the NYSE listing highlighted Vivendi Environnement's "large and expanding position in the U.S., [which was the subsidiary's] second largest market, with nearly $6 billion in annualized sales" at that time. Richard Grasso, the NYSE's then-Chairman and Chief Executive Officer, observed that the NYSE listing provided Vivendi Environnement with a "gateway to the world's largest base of investors."

28.  As news came to light at the end of the Loss Period of Vivendi's near-bankruptcy, the SEC commenced its investigation in this District.  On or about September 24, 2003, the SEC obtained an Order from this Court requiring Vivendi to place $23 million into a judicial interest-

bearing escrow account, representing the payment Vivendi might otherwise have been required to pay to Messier under a lucrative termination agreement he entered into with the Company just prior to his termination in early July 2002. The SEC also obtained an Order from this Court preventing Messier from executing a judgment that he obtained from the New York State Supreme Court, New York County, confirming a $23 million arbitration award to Messier on his claim for compensation under his termination agreement with Vivendi.

29. In addition, the SEC brought enforcement proceedings against Vivendi, Messier and Hannezo in this District for violations of United States securities laws, alleging substantial fraudulent conduct in the United States, including the issuance of false statements to investors in the United States. The SEC asserted that certain of the acts and practices described in its enforcement proceedings that constituted violations of the Exchange Act occurred within this District. In further support of its complaint against Defendants, the SEC alleged that the Court had subject matter jurisdiction over the claims because during the relevant time period Vivendi conducted business and maintained offices in this District, and that during the relevant time period, Messier and Hannezo resided in the District. As part of the resolution of the SEC's enforcement action, Defendants executed a Consent Decree entered in this Court.

30. In April 2004, the SEC issued a cease-and-desist order against John Luczycki, Vivendi's former Chief Accounting Officer and controller, who resided in New York, finding that during the period December 2000 to July 2002, he had violated United States anti-fraud statutes.

31. The United States Attorney's Office for the Southern District of New York also conducted a criminal investigation of Defendants' fraudulent conduct in this District.

32. Subject matter jurisdiction is further supported by the manner in which the same scheme and conduct affected the markets in the United States and overseas. There was but a single market for Vivendi securities. Vivendi securities were priced based on trades reported on the NYSE and the Paris Bourse, both of which are highly integrated. That worldwide market was defrauded by Defendants' conduct, causing extensive effects on the domestic and foreign securities market for Vivendi securities. When the investment community first learned the extent of Vivendi's severely weakened financial condition on July 2, 2002, the price of ADSs on the NYSE and common shares on the Paris Bourse significantly declined in tandem. Again, on August 14, 2002, when Vivendi admitted it was facing a severe liquidity crisis, the price of Vivendi's common shares and ADSs both plunged precipitously by similar percentages.

33. The Court in the Securities Class Action has already exercised subject matter jurisdiction over federal securities claims substantially identical to those brought by Plaintiffs here. In its opinion denying Defendants' motions to dismiss (*In re Vivendi Universal S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) (the "Court's Opinion")), the Court took note that Defendants did not dispute that Messier and Hannezo moved to the United States in September 2001, that Vivendi filed Forms 20-F and 6-K with the SEC, that Defendants disseminated other materials to investors in the United States, and that Vivendi made numerous acquisitions in the United States. The Court further held that the Securities Class Action complaint sufficiently alleged grounds for the Court to exercise subject matter jurisdiction over the claims of foreign investors against Defendants including that:

      (a)    Vivendi had undertaken a scheme to acquire numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, and to successfully accomplish this plan, it took on a $21 billion debt while allegedly fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debt;

- 10 -

(b)     Messier and Hannezo were alleged principal actors in this scheme; and

(c)     they spent half of their time in the United States from the middle through the end of the Loss Period specifically to increase investments by United States investors in Vivendi.

34.     The Court found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the Loss Period, allegedly to better direct corporate operations and to more effectively promote misleading perceptions on Wall Street, that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of the foreign investors' decisions to purchase Vivendi's stock abroad. *Id.* at 70.

35.     In its Order denying reconsideration of the Court's Opinion in the Securities Class Action (*In re Vivendi Universal S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004)), the Court reconfirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because allegedly false statements emanated from the United States; Messier and Hannezo, Vivendi's two highest officers, moved to and operated Vivendi from the United Sates allegedly to better implement a fraudulent scheme; and Messier and Hannezo carried out significant acts in the United States in furtherance of the alleged fraud and as alleged controlling officers of Vivendi.

## III.    PARTIES

36.     MEAG MUNICH ERGO AssetManagement GmbH ("AMG") is a professional investment company established under German law which focuses on the asset management of funds of direct investors from within or without the Munich Re and ERGO Insurance Group. MEAG MUNICH ERGO Kapitalanlagegesellschaft mbH ("KAG") is a professional investment company established under German law (InvG) which focuses on the asset management of funds from within or without the Munich Re and ERGO Insurance Group through special collective

- 11 -

investment trust vehicles. Both AMG and KAG are part of the Munich Re and ERGO Insurance Group, which has more than €178 billion of assets under management and is one of Europe's larger asset management companies.

37.     MEAG, through funds under its management and over which it retained sole investment decision-making authority, purchased 6,037,289 ordinary shares of Vivendi during the Loss Period.

38.     Defendant Vivendi is a société anonyme organized under the laws of France with its principal place of business at 42, avenue de Friedland, 75008 Paris, France. Vivendi has offices in New York located at 800 Third Avenue, New York, NY 10022. Between October 30, 2000 and April 20, 2006, Vivendi was known as Vivendi Universal, S.A.

39.     At all times relevant to this Complaint, Defendant Vivendi described itself as a global conglomerate engaged in business focused primarily on two core areas: "Media & Communications" and "Environmental Services." Vivendi's Media & Communications business was divided into five segments: (a) Music, (b) Publishing, (c) TV and Film, (d) Telecom, and (e) Internet. Defendant Vivendi is the entity created by the Merger and is named as a defendant herein in its own right and as the successor entity and successor-in-interest to Vivendi, S.A.; Seagrams; and Canal Plus, S.A. (Canal +). At all times relevant to this Complaint, Vivendi sold ADSs on the NYSE and common shares on the Paris Bourse.

40.     Defendant Messier was, during the times relevant to this Complaint, Vivendi's Chief Executive Officer and Chairman of the Company's Board until his forced resignation on July 3, 2002. He was a "control person" of Vivendi within the meaning of Section 20(a) of the Exchange Act. Messier received compensation of $4.8 million in 2001 despite the Company's

record loss, as well as various other perquisites (including use of a $17 million apartment the Company acquired for him in New York).

41.    Defendant Hannezo was, during the times relevant to this Complaint, Chief Financial Officer of Vivendi until his resignation on July 9, 2002.  Hannezo was, according to the Associated Press, a "close collaborator" of Messier.  He was a "control person" within the meaning of Section 20(a) of the Exchange Act.

42.    Both Messier and Hannezo, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the relevant period.  Messier and Hannezo both directly participated in the management of the Company; were directly involved in the day-to-day operations of the Company at the highest levels; and were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein.  Both Messier and Hannezo were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein; were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company; and approved or ratified these statements in violation of the federal securities laws.

43.    Because of their Board memberships and/or executive and managerial positions with Vivendi, both Messier and Hannezo had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at

management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

44. The statements made by Messier and Hannezo, as particularized below, were materially false and misleading when made. The true financial and operating condition of the Company, which was known or recklessly disregarded by Messier and Hannezo, remained concealed from the investing public throughout the Loss Period. Both Messier and Hannezo, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein. As officers and directors, and control persons, of a publicly-held company whose ADSs were, at all times during the Loss Period, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Messier and Hannezo both had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. Messier's and Hannezo's misrepresentations and omissions during the Loss Period violated these specific requirements and obligations.

45. Both Messier and Hannezo, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Loss Period. Messier and Hannezo both were provided with copies of the documents alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Because of

their positions and access to material non-public information, both Messier and Hannezo knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations concerning the Company complained of herein were then materially false and misleading. Accordingly, both Messier and Hannezo are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

46. Both Messier and Hannezo are liable as direct participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Vivendi ADSs and common shares during the Loss Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Vivendi's business, operations, management and the intrinsic value of Vivendi ADSs and common shares; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain credit ratings so that it could accumulate more and more debt to make acquisitions on terms favorable to Vivendi; and (iv) caused Plaintiffs to purchase or otherwise acquire Vivendi common shares at artificially inflated prices.

## IV. MESSIER EMBARKS ON AN AGRRESSIVE PLAN TO TRANSFORM VIVENDI INTO AN INTERNATIONAL CONGLOMERATE, PUTTING IT IN A PERILOUS FINANCIAL CONDITION

47. The company now known as Vivendi began its existence in 1853 as a water outfit named Compagnie Générale des Eaux ("CGE"). For more than a century, CGE remained largely focused on the water sector. However, following the appointment of Guy Dejouany as CEO in 1976, CGE extended its activities into other sectors with a series of takeovers. Beginning in 1980, CGE began diversifying its operations from water into waste management, energy, transport services, and construction and property.

- 15 -

48. The drive to push CGE beyond its humble beginnings intensified with Messier's 1996 appointment as Dejouany's successor. Under Messier's stewardship, CGE changed its name to Vivendi S.A. and rapidly embarked on a multi-billion dollar acquisition spree with an eye toward transforming itself into a multinational media conglomerate. Messier spent more than $75 billion in pursuit of this dream, causing Vivendi to acquire significant stakes in a wide variety of companies. For example, Messier spearheaded the following deals between 1997 and 1999:

- The €5.8 billion acquisition of U.S. Filter, "a U.S. group which is the leading global treatment manufacturer of water equipment and systems;"

- The €103.5 million acquisition of Waste Management, Inc.;

- The €932.2 million acquisition of Superior Services following a successful takeover bid;

- The acquisition of a 51% interest in Monaco Télécom;

- A €1.198 billion investment in a joint venture with Elektrim Telekomunikacja that gave the Company a 49% interest in a company that controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan;

- The acquisition of Havas S.A., which in turn acquired Cendant Software, "the world's second leading developer of educational and games computer software," for €678 million; Anaya, a "Spanish publishing firm," for €199.7 million; and MediMedia, "a company specializing in the publication of medical information," for €237 million;

- The acquisition—through its Cegetel subsidiary—of a 49.9% ownership interest in Telecom Developments through investments totaling €518.2 million;

- The €1.25 billion acquisition of a 24.4% interest in British Sky Broadcasting Plc ("BSkyB"), the "leading pay-television company in the United Kingdom and Ireland;" and

- The €794.2 million acquisition of a 49% interest in the holding company that owns 56.5% of Fomento De Constructiones y Contratas ("FCC").

49. By December 2000, Messier had significantly expanded and diversified the Company's holdings, positioning Vivendi to take its place among the world's largest media and

communications conglomerates. Not satisfied with the massive acquisitions to date, Messier embarked on his most aggressive acquisition yet—the €29.5 billion three-way Merger among the original Vivendi S.A., Seagram and Canal Plus S.A. ("Canal+").[1] The Merger closed on December 8, 2000. As the Company proudly announced in its 2000 Annual Report:

> As a result of the Merger Transactions, we are one of the world's leading media and communications companies, with assets that include the world's largest recorded music company, one of the largest motion picture studios and film libraries in the world and leading businesses in the global telecommunications, television, theme park, publishing and Internet industries. We believe that we will become a fully integrated global media and communications company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

50. According to press reports, the Merger had "transformed the Company into the second-largest global media empire after AOL Time Warner." *Vivendi Provides Critics Some Revenue Numbers To Chew On*, The New York Times, Feb. 12, 2002, at W1.

51. Messier continued the acquisition binge before the ink on the Merger Agreement even had time to dry. Mere days after the Merger's completion, Messier announced yet another costly acquisition—the $2.2 billion purchase of Maroc Telecom, giving Vivendi a 35% stake in Morocco's telephone monopoly. The Maroc Telecom acquisition sparked another wave of costly purchases as Messier continued throughout 2001 to gobble up company after company. Notably, Vivendi engaged in the following transactions in 2001:

- The $128 million February 2001 acquisition of Uproar, Inc.;

- The $24 million June 2001 acquisition of EMusic.com;

- The $2.7 billion July 2001 acquisition of Houghton Mifflin; and

---

[1]    The Company is the surviving entity of the Merger.

- The $400 million August 2001 acquisition of MP3.com.

52.    In addition to the costly purchases described above, Messier attempted to acquire luxury-goods mogul Bernard Arnault's internet holding company, Europ@web, for $700 million in March 2001. The acquisition-craved Messier also held secret talks during 2001 to make a multi-billion dollar investment in either AT&T Corporation or Comcast Corporation. Undeterred when these discussions failed to come to fruition, Messier simply moved on to a different target, meeting with the CEO of General Electric—NBC's parent company—at least twice during the fall and early winter of 2001 to see if he could get a deal going with the network. Unfortunately for Messier, GE was not interested.

53.    Vivendi's acquisition spree continued into 2002. In May of that year, Vivendi acquired the entertainment assets of InterActiveCorp—formerly known as USA Networks, Inc.—for a whopping €11 billion. In addition to $1.62 billion in cash, Vivendi gave InterActive $2.5 billion worth of shares of Vivendi subsidiary Vivendi Universal Entertainment LLLP ("VUE"), $1.75 billion of which were encumbered by put/call options under which InterActive could force VUE to buy back the shares.

54.    Messier's acquisition binge, which cost Vivendi more than $75 billion, caused the Company's debt to skyrocket. Specifically, Vivendi financed the €5.8 billion March 1999 U.S. Filter acquisition through a €1.7 billion convertible bond offering, which accounted for the lion's share of the €3 billion debt Vivendi was carrying at the time of the December 2000 Merger. Within eighteen months of the Merger, Messier's aggressive acquisition tactics would cause this figure to increase exponentially—to a staggering $21 billion. By the end of Messier's reign, he had achieved the dubious distinction of leading Vivendi to the biggest debt load in French corporate history.

## V.  DEFENDANTS' FRAUDULENT SCHEME

### A.  The Genesis Of Vivendi's Fraudulent Scheme

55.  Messier's ambitious acquisition program severely threatened the Company's liquidity.  In addition to depleting the Company's cash reserves, Vivendi had used its own stock to finance Messier's acquisitions and borrowed against its future earnings to make up the shortfall.  To keep the spree going, Messier knew that he had to keep the Company's share prices and credit ratings as high as possible.  Unwilling to risk losing the empire he had worked so hard to create, Messier—with the direct involvement of CFO Hannezo—perpetrated a massive accounting fraud to pump up the Company's financial statements and falsely portrayed the Company's true liquidity and cash flow positions, thereby allowing the Company fraudulently to inflate its stock prices to ensure its continued access to additional financing.

### B.  Vivendi Uses Improper Accounting To Shore Up Its Stock Prices

56.  Vivendi employed various types of improper accounting, which had the purpose and effect of materially misstating the Company's financial results during the Loss Period.

#### 1.  Accounting Rules Applicable To Foreign Issuers Of Securities

57.  Foreign issuers of securities that are required to file annual reports with the SEC must report the financial results of their operations in accordance with Generally Accepted Accounting Principles ("GAAP") applicable in the United States, their home country, or some other jurisdiction.  Item 17 of the Instructions to Form 20-F—on which foreign issuers file their Annual Reports—requires that foreign issuers' "financial statements shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles."

58.  During the Loss Period, Vivendi filed annual consolidated financial statements with the SEC on Form 20-F and made additional disclosures on Form 6-K.  While Vivendi's 2000 and

2001 annual reports represented that the Company's financial statements were prepared in accordance with French GAAP, these financial statements purportedly were reconciled to U.S. GAAP. Further, the Company's 2001 Form 20-F—which was signed by Hannezo—represented that the Company's financial information would be communicated on a "U.S. GAAP basis" beginning in 2002 and then reconciled to French GAAP. Despite these representations, Vivendi deviated from U.S. GAAP in several material respects in reporting the results of its operations.

59.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). With the SEC's permission (Accounting Series Release 150), the AICPA established its GAAP principles through three successor groups: the Committee on Accounting Procedure; the Accounting Principles Board (the "APB"); and the Financial Accounting Standards Board (the "FASB").

60.    The financial statements that were issued by Vivendi for the years 2000 and 2001 did not fairly and accurately represent the Company's financial position and operations because they violated the following principles of GAAP:

- That financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (Statement of Concepts ("CON") No. 1, ¶ 34);

- That financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

- That financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

- That financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

- That information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (CON No. 2, ¶¶ 79,80);

- That conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (CON No. 2, ¶¶ 95, 97);

- That revenues and gains generally should not be recognized until realized or realizable, and that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (CON No. 5, ¶ 83); and

- That the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, ¶ 145).

61.    More specifically, Vivendi's financial statements for at least the years 2000 and 2001 were materially false and misleading because Messier and Hannezo manipulated the Company's reported financial results through a host of accounting practices that directly violated specific GAAP provisions as discussed below.

### 2.    Vivendi's Improper Balance Sheet Consolidations

62.    GAAP permits the consolidation of related entities onto a company's balance sheets. Accounting Research Bulletin ("ARB") No. 51 of U.S. GAAP provides:

> The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions. There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

63. U.S. GAAP, however, limits the circumstances under which such consolidation is proper. In general, majority control is a prerequisite for consolidation. ARB No. 51, as amended by FASB's SFAS No. 94, provides:

> The usual condition for a controlling financial interest is ownership of a majority voting interest, and, therefore, as a general rule ownership by one company, directly or indirectly, of over fifty percent of the outstanding voting shares of another company is a condition pointing toward consolidation.

(emphasis added). While majority control is typically required for consolidation, the Emerging Issues Task Force ("EITF")'s Abstract No. 96-16 permits minority shareholders possessing certain rights to overcome the presumption that consolidation requires a majority voting interest in certain limited circumstances. Specifically:

> The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:
>
> 1.    Selecting, terminating, *and* setting the compensation of management responsible for implementing the investee's policies and procedures; [and]
>
> 2.    Establishing operating *and* capital decisions of the investee, including budgets, in the ordinary course of business.

EITF No. 96-16. While the Task Force noted that the above examples were merely illustrative and not necessarily all-inclusive, U.S. GAAP clearly limits the circumstances under which consolidation of entities in which a company owns less than 50% interest is permitted.

64. In fact, APB 18, *The Equity Method of Accounting for Investments in Common Stock*, provides special rules for accounting for an entity of which a company owns between 20-50% and over which the company has the ability to exercise significant influence. Specifically, APB 18 provides:

- 22 -

> In order to achieve a reasonable degree of uniformity in application, the Board concludes that an investment (direct or indirect) of 20% or more of the voting stock of an investee should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over an investee. *Under the equity method, an investor recognizes its share of the earnings or losses of an investee in the periods for which they are reported by the investee in its financial statements.* An investor's share of earnings or losses from its investment is ordinarily shown in its income statement as a single amount. The Board recognizes that determining the ability of an investor to exercise such influence is not always clear and applying judgment is necessary to assess the status of each investment.

APB 18 (emphasis added).

65. Beginning at least with its 2000 financial statements through July 2002, Vivendi violated U.S. GAAP—to which it claimed, in its filings with the SEC, that its financial results were reconciled—by consolidating into its financial statements the results of certain entities in which the Company possessed less than 50% ownership and over which it possessed insufficient control to permit such consolidation. Specifically, Vivendi consolidated the results of French telecommunications company Cegetel—in which it held only a 44% interest—into its own results for 2000 and 2001 and the results of Maroc Telecom—in which it held only a 35% interest—into its own results for 2001. Vivendi—as the owner of between 20% and 50% of Cegetel and Maroc Telecom—should have accounted for these entities using the equity method of accounting, rather than consolidating their financial results into its own.

66. In addition, Vivendi violated SFAS 95, *Statement of Cash Flows*, by improperly consolidating entities whose cash it could not access. Specifically, Paragraph 15 of SFAS 95 provides:

> The information provided in a statement of cash flows . . . should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing . . .

Vivendi's disclosures concerning its cash flows—rather than helping investors to assess it ability to generate positive future cash flows and its ability to meet its obligations—painted a materially false picture of the Company's finances by including cash that it had no right to access on its balance sheets.

67.    These improper consolidations caused Vivendi to misstate materially its financial results. Specifically, the improper consolidation of Cegetel's results with the Company's caused Vivendi to overstate its reported revenues by €5.1 billion and €6.4 billion for the years ended 2000 and 2001, respectively, while Vivendi's reported revenues were overstated in 2001 by an additional €1.4 billion as a result of the improper consolidation of Maroc Telecom, bringing its total overstatement for the year to €7.8 billion. Further, the improper consolidation of Cegetel and Maroc Telecom caused Vivendi to overstate its operating income; earnings before interest, taxes, depreciation and amortization ("EBITDA"); cash flow provided by operating activities; and reported growth rates during these years.

68.    The improper consolidation of Cegetel and Maroc Telecom was a key component of Defendants' fraudulent scheme because it created the false impression that the Company had much higher revenue, EBITDA and cash flow from operating activities than it actually did. These falsified financial results, in turn, ensured that the Company's share prices and credit ratings remained artificially high. Further, by creating the false impression that the Company could readily access these entities' cash to use for its own purposes, the improper consolidation of Cegetel and Maroc Telecom helped Defendants to conceal Vivendi's burgeoning liquidity crisis. Tellingly, following Messier's ouster, Vivendi admitted that it had no right to access the cash flows of Cegetel and Maroc Telecom. Notably, newly-appointed CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that Vivendi did "not have access to Cegetel and

Maroc Telecom." Similarly, Fourtou conceded during an August 14, 2002 conference call with investors that "Vivendi cannot access the cash flow generated by the Companies it owns less than 50% of"—which would have included Cegetel and Maroc Telecom.

### 3.    Vivendi's Improper Failure To Write Down Impaired Goodwill

69.    "Goodwill" is an accounting term used to reflect the portion of the market value of a business entity that is not directly attributable to its assets and liabilities. When one company purchases another for more than the fair value of its assets minus its liabilities, it is required to record goodwill as an asset in its financial statements.

70.    U.S. GAAP's Accounting Principles Board ("APB") Opinion No. 16, *Business Combinations*, sets the amount of goodwill to be recorded as follows:

> The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

Vivendi violated U.S. GAAP by failing timely to write down impaired goodwill on its Canal+ and U.S. Filter acquisitions.

#### a.    Canal+

71.    In connection with the Merger, Vivendi recorded goodwill of €12.544 billion for Canal + — more than the €12.537 amount at which it valued the cost of Canal+.

72.    In the fourth quarter of 2001, Vivendi recorded a €6.0 billion charge for an impairment in the value of Canal+'s goodwill under French GAAP. This was followed by an additional €3.8 billion charge under French GAAP for an impairment in the value of Canal+'s goodwill during the quarter ended June 30, 2002. Accordingly, by June 2002, Vivendi had written off €9.8 billion, or approximately 78%, of the total €12.537 billion cost to acquire Canal+, under French GAAP.

73.  While Vivendi had written off €6 billion in goodwill attributable to the Canal+

acquisition by the end of 2001, Vivendi did not recognize *any* impairment to goodwill under U.S.

GAAP until the first quarter of 2002.   The Company purported to explain this disparate

accounting treatment in its 2001 financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-Lived Assets*
>
> As required under both French and U.S. GAAP [see SFAS No. 121], Vivendi Universal reviews the carrying value of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable.   Under French GAAP, measurement of any impairment is based on fair value.  In 2001, following the recent market decline, particularly in the Internet, media and telecommunications industries, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest).  Under U.S. GAAP, measurement of any impairment is based on the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of (SFAS 121).  *SFAS 121 requires that an impairment loss be recognized whenever the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset are less than the net carrying value of the asset.   On this basis no impairment was indicated and accordingly the goodwill impairment charge was reversed.*

(emphasis added).

74.  SFAS 142, *Goodwill and Other Intangible Assets*, requires intangible assets, such as

goodwill, to be reviewed for impairment in accordance with SFAS 121, *Accounting For The

Impairment Of Long-Lived Assets And For Long-Lived Assets To Be Disposed Of*.  SFAS 121

provides that an impairment loss shall be recognized if the carrying amount of an intangible asset

is not recoverable and if its carrying amount exceeds its fair value.  Specifically, SFAS 121

provides:

1.    An entity shall review long-lived assets and certain identifiable intangibles and goodwill related to those assets to be held and used for impairment *whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable*. The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:

a.    A significant decrease in the market value of an asset

b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset

c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator

d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset

e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that *demonstrates* continuing losses associated with an asset used for the purpose of producing revenue.

SFAS 121 (emphasis added). SFAS 121 expressly requires a goodwill impairment to be recognized if the future cash flows expected to be generated by an asset are less than the carrying amount of an asset. The goodwill impairment taken under French GAAP in 2001 should have caused the Company to take a similar, contemporaneous impairment under U.S. GAAP, which it failed to do.

75.    Moreover, in March 2002 Defendants announced a goodwill write-down under U.S. GAAP. Defendants hid their own wrongdoing in failing to take this write-down sooner by attributing it to the adoption of a new accounting standard—SFAS 142—that changed the

practice for goodwill accounting.[2] By hiding behind the adoption of a new accounting standard, Defendants concealed their improper failure to write down Canal+'s goodwill at the time it took its write-down under French GAAP as required under SFAS 121.

76.  Tellingly, following Messier's and Hannezo's ouster, the Company recorded an additional €3.8 billion impairment in the value Canal+'s goodwill at the end of the first half of 2002 under French GAAP—even though Canal+ had reported revenue growth of 8% during this period.  The fact that Vivendi's new management took additional write-offs of Canal+'s goodwill during a period when its business was actually improving further evidences that the impairment should have been taken earlier.

**b.    U.S. Filter**

77.  Vivendi similarly violated GAAP by failing to write down impaired goodwill for its U.S. Filter acquisition.  While Vivendi recorded €4.577 billion in goodwill for U.S. Filter, this goodwill should have been written down because U.S. Filter was misstating its reported revenue by improperly recognizing all of the revenue expected to be earned on multi-year contracts at the contracts' inception, as set forth more fully below.

78.  In the fourth quarter of 2001, Vivendi belatedly recorded a €2.6 billion impairment in the value of U.S. Filter's assets.  U.S. Filter's goodwill was overstated long before this write-down, which Defendants failed to take in violation of GAAP.

---

[2]     Prior to the June 2001 adoption of SFAS 142, companies were required to amortize goodwill over a period not to exceed forty years.  SFAS 142 prohibited the amortization of goodwill and required companies to carry goodwill on their balance sheets as an asset.

### 4.    Vivendi's Improper Recognition of Revenue On U.S. Filter

79.    In addition to their failure to write down impaired goodwill for U.S. Filter,

Defendants caused Vivendi improperly to recognize revenue on U.S. Filter in violation of

GAAP.  CON No. 5, *Recognition and Measurement in Financial Statements of Business*

*Enterprises,* provides that revenue should not be recognized until it is (a) realized or realizable

and (b) earned.  Similarly, the SEC's Staff Accounting Bulletin No. 101 provides:

> [R]evenue should not be recognized until it is realized or realizable
> and earned.  SFAC No. 5, paragraph 83(b) states that "an entity's
> revenue-earning activities involve delivering or producing goods,
> rendering services, or other activities that constitute its ongoing major
> or central operations, and *revenues are considered to have been*
> *earned when the entity has substantially accomplished what it must*
> *do to be entitled to the benefits represented by the revenues.*"
> Paragraph 84(a) continues *"the two conditions (being realized or*
> *realizable and being earned) are usually met by the time product or*
> *merchandise is delivered or services are rendered to customers . . . ,*
> and revenues from manufacturing and selling activities and gains and
> losses from sales of other assets are commonly recognized at time of
> sale (usually meaning delivery)." In addition, paragraph 84(d) states
> that "If services are rendered or rights to use assets extend
> continuously over time (for example, interest or rent), reliable
> measures based on contractual prices established in advance are
> commonly available, and revenues may be recognized as earned as
> time passes."
>
> The staff believes that revenue generally is realized or realizable and
> earned when *all of the following criteria* are met:
>
> - Persuasive evidence of an arrangement exists,
> - Delivery has occurred or *services have been rendered,*
> - The seller's price to the buyer is fixed or determinable, *and*
> - Collectibility is reasonably assured.

Staff Accounting Bulletin No. 101 (emphasis added).

80.    Vivendi's Form 20-F for the fiscal year ended December 31, 2001 expressly

represented that the Company was following these rules with regard to revenue recognition,

stating:

> *Revenues on public service contracts are recognized as services are*
> *provided.* Amounts billed and collected prior to services being
> *performed* are included in deferred revenues.

(emphasis added).

81. In contravention of these clear rules—and of its own publicly-disclosed revenue recognition policies—Vivendi recognized anticipated revenue from multi-year public service contracts not as services were provided but, rather, upon the signing of such contracts. As the plaintiffs alleged in the Securities Class Action, a former U.S. Filter officer contended that during the Class Period—which coincides directly with the Loss Period—Vivendi Environmental, through its U.S. Filter subsidiary, materially overstated its operating results by implementing a practice known as "booking backlog." This practice permitted Vivendi improperly to recognize and report the *entire dollar amount of long-term fixed price contacts as revenue upon the signing of the contract.* A former U.S. Filter officer stated—according to the complaint filed in the Securities Class Action—that this practice permitted U.S. Filter to overstate revenue on major contracts by as much as ten times. In fact, Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during the year ended December 31, 2001—with its U.S. Filter subsidiary reporting €1.32 billion in revenue in 2000.

82. Vivendi's financial statements were materially overstated during the Loss Period as a result of Defendants' improper recognition of revenue on U.S. Filter in violation of GAAP.

### 5.    Vivendi's Improper Inflation Of Canal+'s Assets

83. In addition to the failure to write down goodwill discussed above, the reported value of Canal+'s assets on Vivendi's balance sheet was also materially and improperly inflated in other respects. Specifically, Vivendi reported as assets on its balance sheet €250 million "marketing rights" that Canal+ purportedly acquired through contracts with five French football

- 30 -

league clubs. As set forth below, however, Hannezo knew—or recklessly failed to discover—that the purported "marketing rights" provided no economic benefit to Canal+ and, accordingly, could not properly be recorded as assets.

84.    According to the Securities Class Action complaint, after Vivendi acquired Canal+, Hannezo reviewed a memorandum dated January 29, 2001 that disclosed that the purported "marketing rights" Vivendi was recording as assets on its financial statements actually belonged to the football league, not to the individual teams with which Canal+ had contracted. Accordingly, these "marketing rights" provided no economic benefit whatever to Canal+. Even though this memorandum flatly warned that recording these contracts as assets would put Vivendi in a "difficult" position with respect to U.S. GAAP reporting requirements, Defendants caused the Company to recognize these "marketing rights" as assets on its financial statements.

85.    Defendants violated U.S. GAAP by recording the "marketing rights" as assets on its financial statements. CON No. 6, *Elements of a Financial Statement*, defines "assets" as "*probable future economic benefits* obtained or controlled by a particular entity as a result of past transactions or events." (emphasis added). As set forth above, however, these "marketing rights" belonged to the football league, not the teams with which Canal+ had contracted. Accordingly, the "marketing rights" did not provide "probable future economic benefits" to Canal+ and were not "assets" under CON No. 6. Vivendi recorded these rights as assets in its year-end financial statements for 2000—which were filed with the SEC on July 2, 2001—in violation of GAAP.

86.    In addition, Vivendi's overstatement of Canal+'s assets caused it to understate the goodwill it recorded for that acquisition. As set forth above, ABP No. 16, *Business Combinations*, required Vivendi to record as goodwill as the difference between the cost of

acquiring Canal+ and the fair value of assets less liabilities. Because Vivendi overstated the fair value of Canal+'s marketing rights, it understated the goodwill it recorded for the Canal+ acquisition.

### 6. Vivendi's Improper EBITDA Manipulation

87. In addition to the accounting improprieties discussed above, Vivendi—in violation of GAAP—improperly adjusted certain of its subsidiaries' reserve accounts and made accounting entries without appropriate support in order to meet the aggressive 35% EBITDA growth the Company had predicted at the time of the Merger.

88. According to a complaint filed against the Company by the SEC, in late June 2001, Defendants became concerned that the Company would not meet its EBITDA target for the quarter ended June 30, 2001. To avoid this, Defendants caused Vivendi to make improper adjustments that raised the Company's EBITDA by almost €59 million—almost 5% of the total €1.12 billion EBITDA Vivendi had reported (excluding the results of the newly-acquired Maroc Telecom) for that quarter.

89. To increase artificially Vivendi's EBITDA, Defendants caused Cegetel to depart from its historical methods of calculating its bad debt reserve during the second quarter of 2001. This change in accounting methodology permitted Cegetel to take a lower provision for bad debts during that quarter than its historical method would have required. Specifically, Cegetel recorded €45 million less for bad debt reserves that it would have had Defendants not caused it to change its accounting methodology, artificially inflating Vivendi's EBITDA in that amount.

90. Vivendi at this time fully consolidated Cegetel's results into its own, which were reconciled to U.S. GAAP. Under SFAS 5, *Accounting for Contingencies*, an entity's bad debt reserve must reflect, at any given point in time, the estimated probable loss inherent in that

entity's accounts receivable. Notably, SFAS 5 prohibits both the use of reserves, including

excess reserves, for general or unknown business risks and the systemic or time release of

reserves into income. Paragraph 23 of SFAS 5 further provides that an estimate of losses on

accounts receivable "normally depend[s] on, among other things, the experience of the enterprise

. . . and the appraisal of the receivables in light of the current economic environment."

91.    The adjustments at Cegetel violated SFAS 5 because Cegetel reduced its provision

for bad debts in the second quarter of 2001 without the appropriate level of documentation or

analysis. Moreover, that Cegetel reduced its reserves at a time when it was actually having

more difficulty collecting on its bad debts strongly suggests that these reserves were being

manipulated improperly. Accordingly, Cegetel's bad debt reserve did not reflect the probable

loss inherent in its accounts receivable and therefore violated SFAS 5.

92.    In addition, Defendants caused Cegetel to defer improperly to the third quarter of

2001 approximately €14 million in provisions for potential future payments and potential

liabilities that should have been booked in the second quarter of 2001. In *toto*, these improper

adjustments amounted to €59 million—permitting Vivendi to meet its 35% EBITDA growth

target for the second quarter of 2001.

93.    Vivendi violated SFAS 5 by using Cegetel's bad debt reserves as an EBITDA

manipulation tool. Because Cegetel's bad debt reserve accounts were not compliant with SFAS

5, Vivendi's financial statements violated U.S. GAAP.

94.    In addition to the second quarter 2001 manipulations with respect to Cegetel, the

SEC complaint charges that the Company improperly boosted the results of its UMG music

division in the third quarter 2001 to meet a predetermined €250 million EBITDA goal for the

division through two improper maneuvers. First, Defendants caused UMG to recognize

prematurely €3 million in deferred revenue that it received in connection with a contract between UMG and other parties *that UMG itself had deferred recognizing* in light of the fact that it would need to be refunded if the parties to the contract failed to meet certain conditions by December 2001. Recognizing this €3 million as revenue before all the conditions were met violated CON 5 and SAB 101. Specifically, CON 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, provides that (1) revenues are realized when goods or services are exchanged for cash; and (2) revenues are considered to have been earned when the company has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. SAB 101, Recognition in Financial Statements, provides that if a transaction falls within the scope of specific authoritative literature on revenue recognition, that guidance should be followed. In the absence of such guidance, the revenue recognition criteria in CON 1—that revenue must be both realized and earned[3] to be reported—should be followed. Because these conditions were not met at the time the Company recorded the UMG revenue, its financial statements violated GAAP.

95.    Second, in late October 2001, Defendants caused Vivendi to reduce temporarily the amount of corporate overhead charges it allocated to UMG by €7 million. Coincidentally, this reduction in corporate overhead charge equaled the exact amount of additional earnings that Vivendi's senior executives determined UMG would need to reach the €250 million EBITDA goal for the division.

---

[3]    Under applicable SEC guidance, revenue is realized or realizable and earned when all of the following criteria are met:  (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed and determinable; and (4) collectibility is reasonably assured.

96.  Defendants' change in the overhead allocated to UMG violated CON No. 6, which provides that allocations must be assigned and distributed "according to a plan or a formula." Further, this change in overhead allocation violated SFAS 131, *Disclosures About Segments of An Enterprise and Related Information,* which provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." Defendants changed the amount of corporate overhead allocated to UMG based not on a plan or formula but, rather, to meet a predetermined EBITDA target.  Accordingly, Vivendi's financial statements violated U.S. GAAP.

### 7.    Vivendi's Failure To Report Pro Forma Metrics Properly

97.  In addition to the EBITDA manipulations described above, Vivendi also violated GAAP through its failure to report pro forma metrics properly.  Notably, Vivendi's unique definition of EBITDA—which served as the basis for calculating both its Operating Income and Operating Free Cash Flow—enabled it to include all amounts from consolidated subsidiaries, even those that were not wholly-owned like Cegetel and Maroc Telecom.  Contrary to the Company's approach, EBITDA does not normally include the amount of earnings from consolidated subsidiaries attributable to minority shareholders.

98.  GAAP—in addition to concerning itself with how to accurately account for transactions—encompasses the meaningful disclosure of all matters accompanying the financial statements.  CON No. 1, *Objectives of Financial Reporting,* provides that one of the primary focuses of financial reporting is information about an enterprise's performance provided by measures of earnings and its components.  Accordingly, under GAAP, pro-forma amounts—such as EBITDA—are considered to be supplemental disclosures designed to assist readers of financial statements in their understanding of certain transactions that generally relate to the

effect of accounting changes (APB 20, *Accounting Changes*) and business acquisitions (APB 16 and SFAS 141, *Business Combinations*). SEC Regulation S-X, Article 11 – *Pro Forma Financial Information* - requires pro forma disclosures in connection with business combinations and for other events or transactions for which disclosure of pro forma financial information would be beneficial to investors. Further, the SEC requires a reconciliation of pro forma amounts with the most directly comparable GAAP amount. For instance, EBITDA would be reconciled to Net Income. Vivendi, however, misstated its EBITDA by consolidating the results of Cegetel and Maroc Telecom. Accordingly, Vivendi failed to report pro forma metrics properly in violation of GAAP.

### 8. Vivendi's Failure To Disclose Its 2% Indirect Interest In Elektrim Telekomunikacja

99. In 1999, Vivendi made a €1.198 billion investment in a joint venture with Elektrim Telekomunikacja ("Telco") that gave the Company a 49% interest in a company that controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan. On June 28, 2001, Vivendi announced a memorandum of understanding pursuant to which it would increase this stake from 49% to 51% via an additional €100 million investment.

100. Vivendi failed to account for 51% of Telco's results in its own in violation of APB No. 18, *The Equity Method of Accounting for Investments in Common Stock*. Notably, APB No. 18 required Vivendi to apply the equity method of accounting to its Telco investment. Under APB No. 18, Vivendi was required to recognize its share of Telco's earnings or losses in its financial statements.

101. Unfortunately for Vivendi, Telco was losing money instead of making it. In fact, Vivendi disclosed in its Forms 20-F that Telco's net income was (€31 million) and (€28 million) in 2000 and 2001, respectively. To avoid having to record Telco's losses on its own balance

sheet, Vivendi flouted GAAP by opting simply to not record the additional 2% of Telco that it

owned. Vivendi overstated its income by failing to record 51% of Telco's results in its own

following its additional €100 million investment.

### 9.    Vivendi Violated The Terms Of Its Own Publicly-Disclosed Accounting Policies

102. Vivendi also violated GAAP by failing to adhere to the terms of its significant

accounting policies as publicly disclosed to the Company's shareholders. ABP 22, *Disclosure of*

*Accounting Policies*, provides:

> Disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of financial positions, cash flows, or results of operations.

As set forth more fully below, Vivendi failed to comply with the terms of its "Significant

Accounting Policies and Practices" as disclosed in its Forms 20-F in violation of ABP 22.

103. In addition to violating GAAP, Defendants' (1) improper consolidation of Cegetel

and Maroc Telecom and (2) failure to consolidate Telco violated the terms of Vivendi's own

accounting policies as disclosed in its Forms 20-F. Vivendi's Forms 20-F described the

Company's policies for such accounting as follows:

> Principles of Consolidation and Accounting for Investments . . . All companies in which Vivendi Universal has greater than a 50% ownership interest or legal or effective control are consolidated. In addition, Vivendi Universal only consolidates a subsidiary if no other shareholder or groups of shareholders exercise substantive participating rights, which would allow those shareholders to veto or block routine decisions taken by Vivendi Universal.

> Significant investments in which Vivendi Universal has 20% to 50% ownership or otherwise exercises significant influence are accounted for under the equity method.

Under the terms of the Company's accounting policies as disclosed in its Forms 20-F, neither

Cegetel nor Maroc Telecom should have been consolidated.  Further, Telco should have been

consolidated.

104. Similarly, Defendants' understatement of bad debt reserves at Cegetel violated the

Company's own accounting policies, which were disclosed as follows in Vivendi's Forms 20-F:

> Use of Estimates. The preparation of financial statements in
> conformity with generally accepted accounting principles requires
> management to make informed estimates, assumptions and
> judgments, with consideration given to materiality, that affect the
> reported amounts of assets, liabilities, revenues and expenses and the
> disclosure of contingent assets and liabilities in the consolidated
> financial statements and accompanying notes.

As set forth above, Defendants reported debt reserves at Cegetel not because they had made an

"informed judgment" as to the propriety of the levels of such reserves but, rather, to manipulate

EBITDA.

105. Defendants' premature recognition of revenue at UMG and U.S. Filter also violated

the Company's accounting policies.  The Company's Forms 20-F stated:

> Revenues and Costs.
>
> Music — *Revenues from the sale of recorded music, net of a*
> *provision for estimated returns and allowances, are recognized upon*
> *shipment to third parties.*
>
> Environmental Services — *Revenues on public service contracts are*
> *recognized as services are provided.* Amounts billed and collected
> prior to services being performed are included in deferred revenues.
> ... Revenues from long-term contracts involving a substantial
> construction component are recorded on the percentage-of-
> completion basis.

(emphasis added).  As set forth above, Defendants prematurely recognized revenue at UMG and

U.S. Filter in violation of these policies.

106. Defendants also recorded worthless marketing rights, in violation of accounting

policies listed in the Forms 20-F:

> Goodwill and Business Combinations All business combinations are
> accounted for as purchases. Under the purchase accounting method,
> assets acquired and liabilities assumed are recorded at fair value. The
> excess of the purchase price over the fair value of net assets acquired,
> if any, is capitalized as goodwill and amortized over the estimated
> period of benefit on a straight-line basis.
>
> * * *
>
> Other Intangible Assets Vivendi Universal has significant acquired
> other intangible assets, including music catalogs, artists' contracts,
> music and audiovisual publishing assets, film and television libraries,
> international television networks, editorial resources and plates,
> distribution networks, customer relationships, copyrights and
> trademarks, among others. Acquired music catalogs, artists' contracts
> and music publishing assets are amortized over periods ranging from
> 14 to 20 years, most other intangibles are amortized over a 40-year
> period, on a straight-line basis.

107. Similarly, Defendants' failure to record a goodwill impairment charge violated U.S.

GAAP and the following accounting policy contained in Vivendi's Forms 20-F:

> Valuation of Long-Lived Assets Vivendi Universal reviews the
> carrying value of long-lived assets, including goodwill and other
> intangible assets, for impairment at least annually or whenever facts,
> events or changes in circumstances, both internally and externally,
> indicate that the carrying amount may not be recoverable.

### C. <u>Vivendi Conceals A Growing Liquidity Crisis</u>

108. Vivendi's costly acquisitions left the Company strapped for cash, creating a liquidity

crisis that threatened its very survival. In addition to the improper accounting discussed above,

Defendants took active steps to conceal this growing liquidity crisis, hoping to thereby prop up

the Company's stock and assure its continued access to financing.

1. **Vivendi Fails To Disclose It Inability To Generate
Expected Cash Flows From Its Costly Acquisitions**

109. A number of Vivendi's most significant acquisitions—including, as set forth above,
Canal+ and U.S. Filter—were not generating the expected revenue that would have been
required to justify Vivendi's publicly-reported "goodwill." Defendants engaged in the improper
accounting described above in an effort to conceal from Plaintiffs and the investing public that
the cash flows from these massive and costly acquisitions were falling far short of expectations.

2. **Vivendi Fails To Disclose The Insufficiency Of Its Working Capital**

110. Further, Defendants failed to disclose the insufficiency of Vivendi's working capital.
Pursuant to Item 5B of the Instructions, Vivendi's Forms 20-F were required to include "a
statement by the company that, in its opinion, the working capital is sufficient for the company's
present requirements, or, if not, how it proposes to provide the additional working capital
needed." In addition, Paragraph 49 of CON 1, *Objectives of Financial Reporting By Business
Enterprises*, provides:

> Financial reporting should provide information about how an
> enterprise obtains and spends cash, about its borrowing and
> repayment of borrowing, about its capital transactions, including cash
> dividends and other distributions of enterprise resources to owners,
> and about other factors that may affect an enterprise's liquidity or
> solvency.

CON 1 at ¶ 49. Defendants failed to comply with the Instructions for completing their Forms
20-F and violated CON 1 by—as set forth above—failing to disclose that (1) cash from Cegetel
and Maroc Telecom was not available to the Company, even though the results of these entities
were consolidated in Vivendi's financial results and (2) the Cegetel current account—as
described below—severely impacted the Company's liquidity.

### 3.   Vivendi Fails To Disclose Acceleration Clauses In Its Loans

111. Further, Vivendi failed to disclose that maturity dates on major loans would accelerate in the event of a downgrade in Vivendi's credit rating.  Specifically, an acceleration clause in one of Vivendi's loan agreements provided that it could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip.

112. Vivendi violated the SEC's Instructions for filing Forms 20-F by failing to disclose these acceleration clauses.  Item 5B of the Instructions to Form 20-F required the Company to disclose "information on the level of borrowings at the end of the period under review, the seasonality of the borrowing requirements and *the maturity profile of borrowings and committed borrowing facilities, with a description of any restrictions on their use.*"  Item 5.B(1)(c) (emphasis added).  Vivendi failed to disclose a very significant restriction on its use of the funds it had borrowed—namely, that it could be required to return immediately all amounts outstanding if its credit ratings slipped.

### 4.   Vivendi Fails To Disclose Its Narrow Avoidance Of A December 2001 Credit Downgrade

113. Due—among other reasons—to acceleration clauses in its borrowing facilities, Vivendi sought at all costs to maintain its credit ratings at high levels.  When the Company was threatened with a credit downgrade in December 2001, Defendants failed to disclose this near-miss to investors.  As reported in The Wall Street Journal, Vivendi narrowly avoided a credit downgrade on December 13, 2001, "which would have made it difficult to borrow money and plunged the company into a cash crisis."  Learning of this potential disaster, Hannezo sent Messier "a desperate handwritten plea.  'I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat,' wrote Mr. Hannezo, the company's chief financial officer.  'All I ask is that all of this not end in shame.'"  John

Carreyrou and Martin Peers, *Damage Control: How Messier Kept Cash Crisis At Vivendi Hidden for Months —Media Giant Was At Risk Well Before Investors Knew,* The Wall Street Journal, Oct. 31, 2002, at A1.

**5.    Vivendi Fails To Disclose Material Commitments Concerning Cegetel**

114. In its Forms 20-F for 2000 and 2001—and, according to a complaint filed against Vivendi by the SEC, in key meetings with analysts from Moody's Investors Services ("Moody's") and Standard & Poor's in December 2001—Defendants failed to disclose future commitments regarding Cegetel that would  have revealed grave doubts about the Company's ability to meet its cash needs.

115. In the summer of 2001, Defendants caused Vivendi to enter into an undisclosed current account with Cegetel, its most profitable and cash-flow positive subsidiary.  Under this current account—which operated in much the same manner as a loan—Cegetel delivered excess cash to Vivendi on a short-term basis beginning in August 2001.  Vivendi paid Cegetel a market rate of interest and agreed to return the funds at the expiration of the current account agreement on December 31, 2001.[4]

116. While Vivendi maintained cash pooling arrangements with most of its subsidiaries, it treated the funds it received from Cegetel differently than it treated these other pooling arrangements.  In addition to the specific expiration date mentioned in the preceding paragraph, the Cegetel current accounts contained an "on demand" clause that entitled Cegetel to demand immediate reimbursement of the funds it deposited with Vivendi at any time.

---

[4]    The return date was subsequently extended to July 31, 2002.

117. Cegetel gave Vivendi approximately €520 million pursuant to the current account in August 2001. This account balance ballooned between September 2001 and June 2002, at times exceeding €1 billion. Vivendi used the money Cegetel gave it under the current account to pay for ordinary operating expenses.

118. Cegetel's right to demand immediate reimbursement of the funds it provided to Vivendi under the current account had a direct impact on the Company's liquidity. Vivendi, however, declined to disclose the existence of this account in its Form 20-F filed with the SEC on May 28, 2002. Item 5B(1)(b) of the instructions for filing Form 20-F, *Liquidity and Capital Resources*, required Vivendi to include in its financial statements the nature and extent of any legal or economic restrictions on the ability of subsidiaries to transfer funds to the Company and to disclose the impact such restrictions have had or are expected to have on its ability to meet its cash obligations. Vivendi failed to make the required disclosure in violation of Item 5B(1)(b).

119. Similarly, Vivendi's failure to disclose the current account violated Item 303 of SEC Regulation S-K. Item 303 requires issuers to identify any known "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." Vivendi violated Item 303 by failing to disclose the Cegetel current account.

120. In addition to violating SEC regulations, Vivendi violated GAAP by failing to disclose the Cegetel current account. Paragraph 2 of SFAS 57, *Related Party Disclosures,* provides:

> *Financial statements shall include disclosures of material related party transactions,* other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business . . . The disclosures shall include:
>
> a.    The nature of the relationship(s) involved;

- 43 -

b.     A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c.     The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

d.     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist.    Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

(emphasis added). Vivendi violated SFAS 57 by failing to disclose the Cegetel current account.

121. By concealing Vivendi's liquidity crisis, Defendants were able temporarily to keep the Company's stock prices and credit ratings at artificially high levels.  When the truth hit the market in July 2002, however, Defendants' carefully-crafted house of cards collapsed, and the Company's common shares and ADSs cratered.

## VI.  VIVENDI'S FALSE AND MISLEADING STATEMENTS

122. On October 30, 2000, Defendants filed Vivendi's Form F-4 (the "F-4"), signed by Messier and Hannezo, with the SEC.  The F-4 contained the registration and prospectus for the Merger.  Further, the F-4 contained Vivendi's historical financial statements for the fiscal year ended December 31, 1999 and the first half of the fiscal year 2000, ended June 30, 2000. Vivendi reported sales of $16.427 billion and net income of $509.1 million for the first half of the fiscal year ended December 31, 2000, and revenue of $17.487 billion and net income of

$254.6 million for the comparable period in 1999. Vivendi also reported shareholders' equity of $11.957 billion and total assets of $73.611 billion as of June 30, 2000.

123. For the reasons set forth in greater detail in Section V.B, *supra*, Vivendi's historical financial statements and balance sheets contained in its F-4 contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings, including (a) improperly consolidating into its financial statements revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b) failing timely to write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter; (c) overstating the Company's revenue from its Environnemental division on certain multi-year contracts; and (d) failing to adhere to the accounting policies described in its SEC filings. In addition, the F-4 contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants did not disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above at Section V.C.

124. On November 1, 2000, Defendants caused Vivendi to file a Form 6-K reporting Vivendi's financial results for first half of 2000, ended June 30, 2000 (the "November 1, 2000 6-K"). The November 1, 2000 6-K stated in pertinent part:

> For the first six months of 2000, Vivendi generated net sales of 19.4 billion euros compared with 18.1 billion euros for first-half 1999, representing growth of 7.4%. This amount takes into account the disposals of Vinci and Nexity with effect from January 1, 2000. It also includes a full six months' impact from the major acquisitions made in 999, notably U.S. Filter and Canal+.

* * *

- 45 -

> The communications and Environnemental services businesses
> accounted for 18.6 billion euros, an increase of 46% which includes
> internal growth of over 15%. Net sales outside France rose 74% to
> 8.6 billion euros.

125. On November 17, 2000, Defendants caused Vivendi to file a 6-K announcing

Vivendi's revenue for the first nine months of 2000 (the "November 17, 2000 6-K"). The filing

reported that Vivendi's revenues for the first nine months of 2000 were as follows:

> 29.1 billion euros, with Environnemental services and
> communications accounting for 28.2 billion euros, a 41.5% increase
> over the 19.9 billion euros as at September 30, 1999. Internal growth
> was close to 14% (19% in communications and 11% in
> Environnemental services).

126. The November 1, 2000 6-K and the November 17, 2000 6-K contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, the Company was engaged in

improper accounting practices that had the effect of materially overstating Vivendi's reported

earnings (as particularized in Section V.B, *supra*), including: (a) failing to timely write down

certain overvalued assets from previous corporate investments and acquisitions; (b) improperly

consolidating into its financials revenue from its Cegetel subsidiary in which the Company had

less than 50% ownership; (c) failing to consolidate revenue from Telco; and (d) overstating the

Company's revenue from certain multi-year contracts. In addition, the November 1, 2000 6-K

and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state

material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity

crisis, as set forth above at Section V.C.

127. On December 22, 2000, Vivendi issued a press release announcing that it had

purchased a 35% stake in Maroc Telecom for approximately €2.3 billion. The press release

- 46 -

stated that the purchase would "have a positive effect on net income before goodwill from 2001, taken that the company is consolidated." This statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the consolidation of Maroc Telecom was improper, for the reasons set forth above.

128. On January 12, 2001, Defendants caused the text of a December 5, 2000 speech to shareholders to be memorialized in a January 12, 2001 Form 6-K filed with the SEC (the "January 12, 2001 6-K"). In the speech, Messier touted Vivendi's quadrupled share price, sevenfold increase in market capitalization, and tenfold increase in operating income. He also reported Vivendi's pro forma revenues of "almost 25 billion euros at the end of 2000, and pro forma EBITDA of 3.2 billion euros in the consolidated businesses alone." Calling the figures "reliable and concrete," Messier projected an additional €220 million of EBITDA in 2002 and more than €400 million in 2003. He went on to state that "[w]e are therefore very comfortable with our business and financial performance forecasts, irrespective of the economic climate in the next two years." Messier's December 5, 2000 speech—and the January 12, 2001 6-K on which it was filed— contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the financial results reported therein, rather than being "reliable and concrete," were achieved as a result of the improper accounting scheme described in Section V.B, *supra*. Further, the revenue and EBITDA results reported in the December 5, 2000 speech—and the January 12, 2001 6-K on which it was filed—were materially false and misleading because Defendants' improper consolidation of the results of Cegetel and Maroc Telecom into Vivendi's own results caused these reported financial results to be materially misstated.

- 47 -

129. On February 2, 2001, Vivendi announced Vivendi Environnement's 2000 results. Total revenue was €26.4 billion. Vivendi cited "internal growth of 10.5% and major acquisitions in 1999" as the primary catalysts behind the 25.7% increase over its 1999 revenues. The press release stated that "[c]hanges in the scope of consolidation had a positive impact of €2 billion. External growth was mainly due to the full year effect of acquisitions made in 1999, principally U.S. Filter and Superior Services." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi's reported revenue was overstated as a result of the accounting improprieties discussed above in Section V.B.2, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting improprieties discussed above in Section V.B, *supra*.

130. On February 14, 2001, Vivendi issued a press release in Paris and New York, memorialized in a February 15, 2001 6-K filing with the SEC (the "February 15, 2001 6-K"). The February 15, 2001 6-K announced preliminary results for the fiscal year ended December 31, 2000 as follows:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion Euros, with media and communications and environmental services accounting for 40.0 billion euros, a global 36.5% increase over 1999. [Messier said that:] "Vivendi Universal was created on December 8, 2000. The 2000 Vivendi [Universal] figures are showing the considerable burst of growth of our communications activities in 2000 both in global growth and even more important with a near 20% internal growth. Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet. This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and EBITDA levels.

131. The February 15, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi's reported revenues were overstated as a result of the accounting improprieties discussed above in Section V.B, *supra*. Further, the February 15, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting improprieties discussed above in Section V.B, *supra*.

132. In a March 8, 2001 Form 6-K (the "March 8, 2001 6-K"), Defendants caused Vivendi to report on a Supervisory Board meeting held the same day and chaired by Messier wherein Vivendi Environnement's financial statements were discussed. The release stated in part that "[n]et debt was reduced from 16.6 billion euros to 13.2 billion euros, and shareholders' equity – including minority interests – was increased from 1.5 billion euros to 8.2 billion euros." Vivendi Universal further announced that net income was €615 million, including non-recurring items after tax.

133. In a March 9, 2001 Form 6-K signed by Messier (the "March 9, 2001 6-K"), Vivendi reported "better than expected" fourth quarter and FY 2000 results. Vivendi announced actual revenues of €41.8 billion for FY 2000, including Media & Communications revenues of €13.6 billion and Environnemental Services revenues of €26.5 billion. The 6-K further stated:

> Vivendi Universal announced today that on a pro forma basis for calendar 2000, the Company reported 7.2 billion euros in EBITDA . . . for the period ending December 31, 2000, up 48 percent from 1999. Results reflect strong performance across the Company's business units -- Media & Communications and Environnemental Services. Actual EBITDA for the 12 months ended December 31, 2000, was 6 billion euros versus 4.3 billion euros in 1999.

- 49 -

134. Vivendi claimed that "the pro forma results were driven by growth in all business segments with the exception of Internet" and further pointed out that "[n]et income climbed 44 percent, before goodwill, to 2.8 billion euros, from 1.4 billion euros." Messier further stated:

> The strong results that Vivendi Universal has generated for calendar 2000 provide a very solid foundation for the Company's growth prospects in 2001. The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001. The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies. The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of each of the Company's business units. I am very confident that, for Media & Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders. . . .Our businesses are strong, our management is focused and growth prospects are real and immediate.

The March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the reported results were not attributable to the stated causes but, rather, to the accounting improprieties discussed above in Section V.B, *supra*.

135. In addition to the reasons discussed above, the January 12, 2001 6-K; the February 15, 2001 6-K; the March 8, 2001 6-K; and the March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B, *supra*), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly

- 50 -

consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the

Company had less than 50% ownership; (c) improperly recognizing revenue from its U.S. Filter

and Canal+ acquisitions; and (d) failing properly to report pro forma metrics. Further, these

statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above

at Section V.C.

136. In a March 30, 2001 Chairman's Statement and Shareholder Newsletter, filed with

the SEC on a Form 6-K on the same date (the "March 30, 2001 6-K"), Messier stated that 2000

pro forma results showed an increase of 20% in revenues and an EBITDA increase of 48%, and

that "[t]he EBITDA rise for the media and communications businesses alone is strong[], reaching

76%." Messier also pointed out that Vivendi was "ahead of our targets for 2000" and that he

could "confirm the ambitious growth targets . . . for media and communications in October

2000: increases of 10% revenues and 35% for EBITDA." He further stated:

> Since the merger [with Seagram and Canal+], the integration of our
> teams has progressed well, enabling us to identify and develop
> synergies. Consumers will soon be seeing the first concrete results.
> In addition, we are in exceptionally fine financial health – our
> communications activities are nearly debt free.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Messier

failed to disclose that Vivendi was neither "in exceptionally fine financial health" nor "nearly

debt free." Further, these statements contained untrue statements of material fact and omitted to

state material facts required therein or necessary to make the statements therein not misleading

because Messier failed to disclose that Vivendi was in a precarious financial condition due to the

improper accounting and Defendants' active effort to conceal Vivendi's liquidity crisis, as

discussed above in Sections V.B and V.C, *supra*.

137. On April 24, 2001, Vivendi issued a press release and filed a 6-K (collectively, the

"April 24, 2001 6-K") announcing "very strong" first quarter 2001 results. The April 24, 2001

6-K announced that Media & Communications' revenues were up 10% to €5.9 billion and that

Telecom's revenues were up 30% to €1.5 billion. The April 24, 2001 6-K further reported that

Media & Communications' EBITDA increased 112% to €900 million and that Telecom's

EBITDA more than tripled to €433 million. The April 24, 2001 6-K quoted Messier as follows:

> I am very pleased with Vivendi Universal's outstanding performance
> in our first quarter as a new company. All our results meet or exceed
> our key operating targets. We created significant momentum by
> delivering solid first quarter 2001 results in EBITDA, which more
> than doubled, and by generating double digit revenue growth.
>
> These results show the focus and dedication of all our management
> teams, in executing the unique promise of Vivendi Universal around
> its global strategy. This is a great beginning. With our momentum,
> our targets and the drive of our executive team, I am extremely
> confident that, for Media & Communications, we will reach our
> annual EBITDA and revenue growth targets of 35% and 10%,
> respectively in 2001 and 2002 and achieve superior returns for
> Vivendi Universal shareholders.
>
> We are also ahead of targets for the synergies which indicate that the
> path of integration between our teams is great. My only focus is and
> remains execution of this compelling media merger.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the results reported were not attributable to the stated caused but, rather, to

the improper accounting described above in Section V.B, *supra*.

138. On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's
shareholders' meeting, the transcript of which was subsequently filed on the June 26, 2001 Form
6-K (collectively, the "June 26, 2001 6-K"):

> The foundations of our communications related businesses are
> particularly healthy and strong. I would just like to emphasize a few
> points:
>
> a healthy balance sheet with total equity reaching 66 billion Euros;
>
> a pro forma net debt that is practically non-existent - around three
> billion Euros;
>
> Vivendi Universal posted record-high net income, and has cash
> available for investing (participation in BskyB, etc.);
>
> Vivendi has rapidly growing revenue, which reach the double digits
> annually, spread out through all the European and American markets
> (60% and 40%); extraordinarily large customer bases; several dozen
> million subscribers; business models often based on subscription -
> meaning loyalty, recurrence, predictable revenues, and very little
> dependence on the advertising market.
>
> Financially, Vivendi Universal, concerning the communications
> sectors, is rock solid - very stable with high growth.
>
>                 * * *
>
> In my role as the chairman and as an employee of the company, I owe
> you the company's results. Here they are. They are good. . . .
> Vivendi Universal, our company, your company, is solid. Today, we
> are a leader, strong, dynamic, and profitable.

139. On May 18, 2001, Vivendi filed a Form 6-K with the SEC and issued a press release
providing total revenue information for first quarter 2001 (collectively, the "May 18, 2001 6-K").
The May 18, 2001 6-K stated in part:

> Vivendi Universal revenue for first quarter of 2001 totaled 12.6
> billion euros, a global 34.5% increase over the first quarter of the
> prior year.    Vivendi Universal's media and communications
> businesses accounted for 5.9 billion euros and environmental services
> businesses accounted for 6.7 billion euros.

140. In addition to the reasons discussed above, the March 30, 2001 6-K; the April 24, 2001 6-K; the June 26, 2001 6-K; and the May 18, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

141. On July 2, 2001 Vivendi filed its Form 20-F, signed by Hannezo, for the fiscal year ended December 31, 2000 with the SEC (the "2000 Form 20-F"). The 2000 Form 20-F contained Vivendi's consolidated financial statements for the years ended December 31, 2000, 1999 and 1998 and as at December 31, 2000 and 1999. The 2000 Form 20-F stated as follows:

> For the years ended December 31, 2000, 1999 and 1998, we had a net income under U.S. GAAP of €1,907.8 million, € 246.1 million and €565.2 million, respectively, compared to €2,229.0 million, €1,431.4 million and €1,120.8 million under French GAAP. Under U.S. GAAP, shareholders' equity was €64,729.4 million and €16,954.5 million for 2000 and 1999, respectively, compared to €56,671.1 million and €10,892.2 million under French GAAP.

142. The 2000 Form 20-F further reported on marketing rights, stating:

> As of January 1, 2000, the following new accounting principles were adopted:
>
> * * *
>
> Sports broadcasting rights acquired by Canal Plus are now capitalized as intangible assets and are amortized over the period of the agreement. The cumulative effect of this change had no impact on net income in 2000 and 1999. Total assets increased by €2.0 billion (most of which related to intangible assets) and total liabilities and shareholders' equity increased by the same amount.

143. When discussing Accounting Policies, the 2000 Form 20-F stated that revenues and costs for the music segment were recognized upon shipment to third parties and that revenue relating to public service contracts was recognized when the services were rendered.

144. For the reasons set forth in greater detail in Section V.B, *supra*, Vivendi's historical financial statements and balance sheets contained in its 2000 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, Defendants failed to disclose that the Company improperly consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership), improperly manipulated EBITDA, failed to timely write down impaired goodwill from previous corporate investments and acquisitions, including Canal+ and U.S. Filter, overstated the Company's revenue from its Environmental division on certain multi-year contracts in violation of GAAP, failed to adhere to the accounting policies described in its SEC filings, and inflated the value of certain Canal+ assets. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above at Section V.C.

145. On July 23, 2001, Vivendi Universal issued a press release and filed a Form 6-K (collectively, the "July 23, 2001 6-K") announcing its "very strong" second quarter and first half 2001 Media & Communications results. Vivendi reported Media & Communications' revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew 57% to €1.3 billion. Concerning Vivendi's first half 2001 results for Media & Communications businesses, the press release stated in part:

> In the course of the first half of 2001, Vivendi Universal achieved three quarters of its full-year target of incremental EBITDA (nearly 800 million euros excluding Maroc Telecom, relative to the company's target of slightly more than 1 billion euros).

> In the first half of 2001, revenues increased to 12.4 billion euros (up 15% [excluding USG]), and EBITDA *grew* to 2.2 billion euros (up 77% over 2000 comparable period).

> During a strong second quarter, revenues increased 16% to 6.6 billion euros, and EBITDA grew 57% to 1.3 billion euros.

> Excluding Maroc Telecom, revenue growth was 8%, and EBITDA growth was 35% for the second quarter. For the first half of 2001, revenues were up 11% and EBITDA was up 62%. [footnotes omitted]

146. The July 23, 2001 6-K also reported on the Telecom segment, reporting

> Telecom EBITDA was €703m for the quarter ended June 30, 2001 and €1.1b for the first half ended June 30, 2001.

> * * *

> Telecom registered an excellent second quarter and a half year. The second quarter of 2001, revenues increased by 51%, and EBITDA grew by 70% versus second quarter 2000.

147. Messier commented on the results, stating in part as follows:

> The results produced by Vivendi Universal in the second quarter are well ahead of market consensus. . . . They confirm the robustness of our businesses . . . and the fast progress of the reorganization and implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target for the full year 2001 [(1.12 billion euros of incremental EBITDA, or 35%, over the pro forma 2000 guidance provided last October and slightly above 1 billion euros of incremental EBITDA over the final 2000 results)] already achieved in the first half of the year, I can only re-emphasize our confidence. We will at least meet our stated targets.

Obviously, our current stock price does not fully reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth. With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today.

The first half has been a period of total operational focus in each of our businesses, while completing significant achievements in the implementation of the merger, reorganization and execution of our strategy.

148. Following the July 23, 2001 press release, Vivendi hosted a conference call to discuss the second quarter 2001 results and the Company's business and prospects. A July 26, 2001 analyst report by Commerzebank reported that "Messier is confident the company will reach its own targets." As the plaintiffs in the Securities Class Action allege, during the conference call, Messier and others in Vivendi management stated:

Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that Vivendi was able to achieve the purportedly "strong results" reported only as a result of the accounting improprieties discussed above in Section V.B, *supra*, and Defendants' active concealment of the Company's burgeoning liquidity crisis, as discussed above in Section V.C, *supra*.

149. On August 10, 2001, Vivendi Universal issued a press release and filed a 6-K (collectively, the "August 10, 2001 6-K") announcing its total revenue for the first half of 2001, including the second quarter. Second quarter 2001 revenue totaled €13.9 billion, "comprised of 6.6. billion euros for media communications businesses and 7.3 billion euros for environmental services businesses." The first half of 2001 total revenue for Vivendi Universal was €26.4 billion, "comprised of 12.4 billion euros for media and communications businesses and 13.9 billion euros for environmental services businesses."

150. In early September 2001, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its common shares declined from the mid-€50s to the mid-€40s. In response, Defendants categorically denied any problems. Vivendi, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002. Messier stated in an interview with Reuters that evening that "no profit warning of any kind needs to be feared coming from Vivendi Universal." Messier's statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi's security in its targets and in the fact that it would not have to issue any profit warning was attributable to the accounting improprieties discussed above in Section V.B, *supra*, and to its active concealment of the Company' liquidity crisis discussed above in Section V.C, *supra*.

151. On September 25, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "September 25, 2001 6-K") announcing "Strong First Half 2001" results and a "Solid Outlook for 2002." The press release reported that revenues increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per

share.  With respect to Media & Communications, the release reported that first half 2001

revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion, up 77%, and that

operating income nearly tripled to €946 million, up 184%.  Concerning Vivendi's

Environnement business, the release reported that revenues were up 11% to €13.9 billion, that

EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97 billion.

In the filing, Messier commented:

> Despite the current environment, we will reach all our previously
> stated revenue/EBITDA objectives for the 2001 year.  I continue to
> express my confidence in achieving our more than 10% revenue
> growth targets for 2001 and our more than 35% EBITDA growth
> (versus the company's October 2000 guidance) at a constant asset
> base.  This, combined with some extensions in the company's asset
> base (i.e., Maroc Telecom and Houghton Mifflin), should result in
> full-year Media & Communications EBITDA slightly north of 5
> billion euros.  In the current Environnement, giving a 2002 target
> would not be meaningful, and we have yet to complete our 2002
> budget and plan process.  Before the recent tragedy [of September
> 11], market consensus for 2002 EBITDA was not far from 6 billion
> euros.  Despite the events, looking at the trends of our businesses and
> our defensive qualities, we are currently very confortable [sic] with
> this expectation.  (Footnote omitted.)

152.  On October 17, 2001, Vivendi Universal filed a Form 6-K (the "October 17, 2001 6-

K") announcing its consolidated half-year financial statements as filed with regulatory

authorities in France.  The October 17, 2001 6-K reported:

> In the first half of 2001, Vivendi Universal's revenues increased to
> €26.4 billion from €19.4 billion in the comparable period of 2000.
> On a pro forma basis the revenue increase was 11.5%
>
> The parent company recorded revenues of €64.1 million and net
> income of €149.7 million in first half 2001.

Media & Communications reported a revenue increase to "€12.4 billion, up 12.4% over the pro

forma first half of 2000.  Excluding Maroc Telecom and Universal Studios Group ('USG')

Filmed Entertainment, revenue growth was 11%." Environnemental Services reported revenues of "€13.9 billion compared to €12.5 billion in the first half 2000, an 11.3% increase."

153. The July 23, 2001 6-K, the August 10, 2001 6-K, the September 25, 2001 6-K and the October 17, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing timely to write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the inflation of certain Canal+ assets. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

154. On October 30, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "October 30, 2001 6-K") announcing its third quarter 2001 Media &

Communications results.  The October 30, 2001 6-K announced that Media & Communications'

revenues were up 24 % to €7.3 billion, and that EBITDA was up 90% to €1.5 billion.  This 6-K

further reported that Telecom's revenues increased by 17%, and EBITDA grew by 31% versus

pro forma results for the third quarter of 2000.  Music EBITDA was €250 million for the quarter

ended September 30, 2001 and €702 million for the nine months ended September 30, 2001.

UMG reported a 6% increase in EBITDA to €250 million.  The 6-K also stated in pertinent part:

> On a pro forma basis, third quarter revenue growth was 8%, and
> EBITDA growth was 30%.  Year-to-date revenues increased 9%, and
> EBITDA increased 46%.

> Company reaffirms confidence in achieving its growth targets: 10%
> revenue growth and 35% organic EBITDA growth in 2001.

155. Messier was quoted in the October 30, 2001 6-K as follows:

> Our third quarter results for the media and communications
> businesses, with 24% revenue and 90% EBITDA growth, including
> organic growth of 8% and 36% respectively, are obviously strong
> despite the tough environment. . . . They reflect both our higher
> potential for growth and greater resiliency to recessionary
> environments compared to many of our peers.

> \* \* \*

> Additionally, Vivendi Universal's media and communications
> businesses are presently less vulnerable to recessionary environments
> than many of our peers because of our strong defensive qualities.

> \* \* \*

> Having the highest resiliency and lowest sensitivity to a recessionary
> environment explains our ability to outperform most of our peers.

> \* \* \*

> An early look at the fourth quarter indicates that we are on track to
> meet our targets.  I continue to express my confidence in achieving
> 10% revenue growth and 35% EBITDA growth in 2001 at a constant
> asset base.  This, combined with some expansions in the company's
> asset base (i.e., Maroc Telecom and Houghton Mifflin), should result
> in full-year Media & Communications EBITDA slightly above 5
> billion euros. (Footnotes omitted.)

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting improprieties discussed above in Section V.B, *supra*, and to Defendants' concealment of the liquidity crisis discussed above in Section V.C, *supra*.

156. Following the release of the October 30, 2001 6-K, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects. As reported in the complaint in the Securities Class Action, during the call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share;
>
> The Company was still on track to achieve strong growth in revenues and earnings in 2001.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that the Company was only able to achieve the results reported through the accounting improprieties discussed above in Section V.B, *supra*, and through their concealment of the liquidity crisis the Company was facing, as discussed above in Section V.C, *supra*.

157. Based on Defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's reported financial results. For example, on October 31, 2001, ING Barings ("ING") issued a "Strong Buy" recommendation, stating:

> Vivendi . . . is one of the few media groups not to have issued a profit warning since the beginning of the year. Management has stressed its

confidence once again and remains comfortable with the consensus forecasts.

158. On November 14, 2001, Vivendi Universal filed a Form 6-K (the "November 14, 2001 6-K") incorporating Messier's shareholder newsletter.  Messier trumpeted Vivendi Universal's first-half 2001 earnings as "good" and stated that "we are in a position to confirm our annual targets with confidence despite the economic climate."  He further stated:

> For the company as a whole, revenues are up 11%, generating a 42% increase in EBITDA to almost 4 billion euros.  The Media & Communications businesses posted a 77% increase in EBITDA and a 184% increase in EBIT, while Environmental Services businesses have continued to grow steadily in terms of both revenues (11%) and EBITDA (12%).  Vivendi Universal's primary strength is its operational strength.

159. On December 6, 2001, Vivendi issued a press release and filed a Form 6-K announcing Edgar Bronfman, Jr.'s ("Bronfman") decision to resign from his position as Executive Vice Chairman of Vivendi.  Bronfman remained as "Vice-Chairman of the Board and an advisor to the company."  Commenting on Bronfman's resignation, Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business."  Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a precarious financial position as a result of the accounting improprieties discussed above in Section V.B, *supra*, and was suffering from a liquidity crisis, as discussed above in Section V.C, *supra*.  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi's purportedly "solid performance" was attributable to the accounting improprieties discussed above in Section V.B, *supra*, and to

- 63 -

Defendants' active concealment of the liquidity crisis the Company was facing, as discussed

above in Section V.C, *supra*.

160. On December 11, 2001, Defendants caused Vivendi to file a Form 6-K (the

"December 11, 2001 6-K") announcing the revenue figures filed with French authorities. In the

Form 6-K, Vivendi announced:

> [T]he company's Media & Communications businesses reported pro
> forma revenue growth of 9% for the year ended December 31, 2001,
> reaching 28.9 billion euros.  Revenue growth was 10% using the
> 2000 perimeter excluding Universal Film, exactly in line with
> management estimates given 12 months ago.

Messier further stated that he was "pleased that we achieved our ambitious target of 10% organic

revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and

Canal+."

161. The October 30, 2001 6-K, the November 14, 2001 6-K and the December 11, 2001

6-K contained untrue statements of material fact and omitted to state material facts required

therein or necessary to make the statements therein not misleading because, *inter alia*, the

Company was engaged in improper accounting practices that had the effect of materially

overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a)

failing to timely write down overvalued assets from previous corporate investments and

acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc

subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's

revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the

inflation of certain Canal+ assets.  In addition, these statements contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading because Defendants failed to disclose that Vivendi was

suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would

necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

162. In a December 13, 2001 press release, the Company announced that it had "authorized Goldman Sachs and Deutsche Bank to carry out a [$1.5 billion] placement of BSkyB share certificates that must be converted in October 2002." The press release went on to state:

> Following last week's sale of 9.3% of Vivendi Environnement and with this transaction, Vivendi Universal will then be in a position to cover any needs that may arise from various opportunities for strategic partnerships in the U.S. television and distribution segments. Such opportunities may or may not be taken up.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section V.C, *supra*.

163. The next day, on December 14, 2001, the Financial Times (London) reported on the announced sale of Vivendi's $1.5 billion interest in BSkyB and the sale of a $1.06 billion interest in Vivendi Environnement. The article quoted Vivendi as stating that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section V.C, *supra*.

- 65 -

164. On December 17, 2001, Vivendi issued a press release in Paris and New York and filed a Form 6-K announcing the acquisition of USA Networks for $10.3 billion in combined stock and cash. The acquisition was financed by an exchange of securities and "limited" cash outlay by Vivendi. Commenting on the acquisition, Messier stated in pertinent part:

> Our strategy is clearly coming together. Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.

> * * *

> In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level – EBITDA, net income and free cash flow. By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.

> * * *

> At the end of just one year following our merger with Seagram and Canal+, we have put the pieces together in fulfilling our strategy. In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S. - and here we are today. We expect that 2002 will be a year of growth, without further change in perimeter.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the Company was not "strongly positioned to enhance performance and value to Vivendi Universal shareholders" but, rather, was in a precarious financial condition due to the Defendants' concealment of Vivendi's liquidity crisis from the investing public.

165. On December 17, 2001, Messier held a press conference with Barry Diller, Chairman and CEO of USA Network, from the St. Regis Hotel in New York City to discuss the

acquisition of USA Networks, the creation of Vivendi Universal Entertainment ("VUE"), and

Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on Vivendi Universal. On the reverse, what it allows us to do is to increase our [EBITDA] target for 2002 by more than ten percent. It's to increase our net income in 2002 by roughly 200 million dollars. It's to increase the net free cash flow of the group in 2002 by, let's say three hundred and fifty million dollars. At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.
>
>         * * *
>
> As far as the global [debt] ratio of the group is concerned, our target is to have in '02 a debt to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002, which means that Vivendi Universal will end up its program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . . So, no cleaning of balance sheet because the balance sheet is clean. . . . [W]e are committed to issue full U.S. [GAAP] earnings starting Q1 of '02. We already, in fact, worked on the basis of U.S. [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02. So we are already applying all U.S. [GAAP] methodologies, including those relating to amortization.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Messier

failed to disclose that Vivendi was not applying "U.S. [GAAP] methodologies" but, rather, was

engaging in accounting improprieties as discussed above in Section V.B, *supra*.

    166. As the plaintiffs in the Securities Class Action alleged, on February 6, 2002, AFX

News Limited reported that in an attempt to dispel concern about the Company's debt levels and

accounting practices, a letter was distributed to the Company's employees stating that no profit

warnings were forthcoming:

Vivendi Universal CEO Jean-Marie Messier said the media company
will not make any change in its guidance for 2001 earnings due for
release on March 5, although the fourth quarter was a difficult period.

Messier made the comment in a letter to Vivendi's staff, addressing
the recent volatility and losses in the company's share price...

"Some global markets, including the music market, declined during
this period.  But despite the difficulties, we are the only media
company not to have issued a profit warning on its operating results
and there's no change to that situation," said Messier.

"There are no hidden risks and no speculative instruments," he said.

Messier's statements contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because,

contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting

improprieties and liquidity crisis discussed above at Sections V.B and V.C, *supra*.

167. On February 11, 2002, Vivendi issued a press release (the "February 11, 2002 Press

Release") announcing its year-end 2001 Media & Communications results.  Vivendi announced

Media & Communications "pro forma revenue growth of 9% for the year ended December 31,

2001, reaching 28.9 billion euros."  The release further reported that Vivendi's Telecom segment

achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10% using the 2000

perimeter excluding Universal Film, exactly in line with management estimates given 12 months

ago."

168. Commenting on the results, Messier stated:

I am pleased that we achieved our ambitious target of 10% organic
revenue growth in 2001, for the businesses resulting from Vivendi's
merger with Seagram and Canal+.  Organic growth is, more than ever
in today's markets, the most important strength of Vivendi Universal.
Achieving the highest level of growth in our industry is a big
differentiation of Vivendi Universal, and the operating management
deserves recognition for fulfilling their growth objectives and
outperforming their peers in a difficult year.  Our 2001 results give us
confidence that we can achieve our growth targets again in 2002.

- 68 -

169. The February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts; and (d) failing to follow its own accounting policies. In addition, the February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

170. On March 4, 2002, Messier was quoted in the Financial Times as stating that Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: "There are no hidden risks and no speculative instruments." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting improprieties and liquidity crisis discussed above at Sections V.B and V.C, *supra*.

171. On March 5, 2002, Vivendi issued a press release and filed a Form 6-K (collectively, the "March 5, 2002 6-K") proclaiming its year-end 2001 results. Vivendi

announced that revenues of €57.360 reflected a 10% increase and that operating income of €3.795 billion reflected a 47% increase, on a pro forma basis.

172. The March 5, 2002 6-K included financial information by business segment. The release further reported Media & Communications revenues of €28.115 billion, representing 10% pro forma revenue growth; EBITDA of €5.036 billion, representing 34% pro forma EBITDA growth; and operating income of €1.838 billion, representing 89% pro forma growth. In addition, Telecom's pro forma revenue was up 24% to €8 billion and its EBITDA increased 49% to €2.5 billion. Further, the March 5, 2002 Form 6-K listed Telecom EBITDA of €2.3 billion as 46% of Media & Communications EBITDA of €5 billion. Telecom's operating income was €1.3 billion, which was 72% of Media & Communications' operating income of €1.8 billion. The Telecom pro forma EBITDA was reported as growing by 49%, with Maroc Telecom reporting a pro forma EBITDA gain of 33%. EBITDA was discussed as follows:

> EBITDA consists of operating income before depreciation, amortization (including film amortization at CANAL+ Group and book plate amortization at VUP), restructuring charges and other one-time items (principally reorganization costs at CANAL+ Group), and does not reflect adjustment for any minority interests in fully consolidated subsidiaries. EBITDA is presented and discussed because Vivendi Universal management considers it an important indicator of the operational strength and performance of its Media & Communications businesses, including the ability to provide cash flows to service debt and fund capital expenditures.

> \* \* \*

> U.S. GAAP requires consolidation by whatever company manages the assets, controls the board of directors and possesses majority voting control. VU is required under U.S. (and French) GAAP to consolidate Cegetel and Maroc Telecom since they meet these criteria.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the

consolidation of Cegetel and Maroc Telecom was not "required" under U.S. GAAP but, rather,

violated GAAP as set forth above in Section V.B, *supra*.

173. In discussing off balance sheet transactions, Vivendi stated that there were "no off-

balance sheet loans that have not been disclosed or any such items that would create accounting

benefits" and that Vivendi regards "cash as king."  Vivendi attached a document to its March 5,

2002 Form 6-K that would "provide full disclosure of our off balance sheet financing as well as

other matters" for the Media & Communications division. Here, Vivendi stated that

"[p]hilosphically, VU prefers to keep its obligations on the balance sheet." Only two off-balance

sheet financing vehicles were reported: "two qualifying special purpose entities associated with

the sale of 400 million BSkyB shares." These statements contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because Vivendi failed to disclose the existence of a significant

obligation—the Cegetel current account, as set forth above in Section V.C.5, *supra*.

174. Vivendi also reported a charge for impairment to goodwill under French GAAP of

€12.6 billion, including €6 billion for Canal Plus.  Debt in French GAAP was listed as €14.6

billion for the Media & Communications activities; under U.S. GAAP, debt was €19.1 billion.

The release also stated in part:

> After having been the only large media company not to modify any of
> its guidance for the year 2001, Vivendi Universal reiterates its
> confidence in the strength of its businesses and their performance and
> their ability to grow.  For 2002, no other new guidance will be
> expressed, apart from the company's full confidence to reach for its
> Media & Communications businesses.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because

Defendants—despite their alleged "confidence" in the strength of Vivendi's business—were

concealing both the accounting improprieties discussed above in Section V.B, *supra*, and the

liquidity crisis discussed above in Section V.C, *supra*.

175. The March 5, 2002 6-K also touted the Company's "Operating Free Cash Flow" as

being "ahead of guidance" and announced Media & Communications operating free cash flow of

€2.026 billion, "up 2 billion euros over 2000." Commenting on the results, Messier stated in part

as follows:

> I am very pleased with the excellent operating results that have been
> achieved. These results confirm the strength of Vivendi Universal's
> businesses across the board despite a very difficult global economic
> environment.

> Most of our businesses improved market share, EBITDA and free
> cash flow during this period of global economic slowing. Even more
> important, those operational performances are showing improvement
> at every level of our P&L. The good EBITDA to EBIT
> transformation ratio: 68% of incremental EBITDA translating in
> incremental EBIT, is a strong and positive sign. The improvement of
> operational free cash-flow (FCF) at a higher rate than EBITDA
> indicates the clear focus given in 2001 to cash management. We will
> continue this effort.

* * *

> We stay fully committed to conveying full transparency in our
> financial results. Vivendi Universal is not only transparent but is the
> only media and communications company not to change its numbers
> and targets, it underscores its commitment to accurate, conservative
> and consistent reporting in every area of its operations.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the results reported were not attributable to the reasons stated but, rather, to

the accounting improprieties discussed above in Section V.B, *supra*, and their active

concealment of the liquidity crisis discussed above in Section V.C, *supra*. Further, these

statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing improper accounting to burnish the Company's actual performance, as discussed above in Section V.B, *supra*.

176. The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

177. On March 5, 2002, during an investor conference call, Messier discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted to minimize the importance of the $12.6 billion write down in goodwill as follows:

> I just want to say a very quick points before going to your questions. And I - the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we

> continue or renewed on the EBITDA growth target results and add to
> our main in the quarter'01. We did all of this. Our operating pre
> cash flow target, we average Euro 2 million instead of the guidance
> of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you
> go to cash the more we over this – the guidance that we gave to the
> market is a strong sign of the quality of the casual management in
> working above the requirements and CAPEX management in'01.
> That goes to the same direction is that we did overcome largely all
> targets in terms of cash service. We save Euro 200 million EBITDA,
> we reach 300 EBITDA 100 more, and close to Euro 600 million total
> cash savings. The operations and these business achievements, I
> think that we owed them to our competitive advantages that were
> evident in'01. That: (1) the excellent quality of management; (2) the
> fact that we gain market share in about every single of our business.
> Those gains of market shares coming from [scale and scope]; (3) the
> assets mix, maximize our ability to go to digitalization for delivery on
> the mobile devices; and (4) to our global footprint minimizes of
> earnings volatility. That's the business achievement.

Messier also attempted to downplay the impairment charges as a choice of switching from French

GAAP to U.S. GAAP in order "to be even more transparent." Messier stressed the non-cash

nature of the impairment charge.

178. As reported in the Securities Class Action Complaint, Lehman Brothers issued a

report on March 6, 2002 based, in part, on the statements made by Vivendi's management in the

March 5, 2002 conference call:

> In its post results conference call, management confirmed that the
> value adjustments to the U.S. assets . . . reflected largely a change in
> accounting treatment and did not signal a negative outlook for the
> U.S. water business.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the goodwill write-down was not attributable to a change in accounting

but, rather, to the fact that the Company had been overstating goodwill all along, as set forth

above in Section V.B.3, *supra*.

179. Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002 conference call, stating in pertinent part as follows:

> For '02, Management reiterated their guidance of 10% organic sales growth for all the Media Communications businesses. Vivendi also expects EBITDA of close to €6 billion (pre-USA Networks and pre-Stream). . . .
>
> A list of ten accounting 'issues' relating to off-balance sheet financing was published in conjunction with the results and the group is today holding an accounting workshop to clarify the impact of moving to U.S. GAAP when it reports Q1'02 results this year.
>
> * * *
>
> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

The statements made by Vivendi management contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that they expected to reach the reported goals by employing improper accounting, as discussed above in Section V.B, *supra*, and by continuing to conceal to Company's liquidity crisis, as discussed above in Section V.C, *supra*.

180. On April 4, 2002, Messier filed another shareholder newsletter on Form 6-K (the April 4, 2002 6-K"). In it, he confirmed that "Vivendi Universal has met its targets in 2001." He went on to state:

> Our media and communications businesses posted EBITDA . . . of 5 billion euros (a 34% pro forma growth), and operating income of 1.8 billion euros (an 89% pro forma growth) and operating free cash flow of 2 billion euros, which is above projections. These results were achieved with a 10% pro forma revenue growth to 28.9 billion euros. If we include our subsidiary Vivendi Environnement, total pro forma revenues amount to 58.2 billion euros.

Our business in media and communications have improved their performance, with strong EBITDA growth for Cegetel, TV and Film . . ., and Vivendi Universal Publishing. . . .

Achieving these results during the general economic downturn of recent months was no easy task. But it is in tough situations like this that we can demonstrate our capacity. The proof is there, thanks to the quality of our teams and our products.

Messier's statements contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that Vivendi was able to meet its target and posts the results reported only by

employing improper accounting, as discussed above in Section V.B, *supra*, and by continuing to

conceal to Company's liquidity crisis, as discussed above in Section V.C, *supra*.

181. When addressing the reported accounting losses of €13.6 billion, Messier pointed

out that "this loss results from a write-down of the value of certain assets taken purely for

accounting purposes. There is no actual cash disbursement." He went on to blame the losses on

"our anticipated application of U.S. GAAP," stating:

The change involves several technical modifications, the most significant being the re-evaluation of acquired assets at current market values. Taking into account the stock market decline, the following companies have been reduced on our balance sheet. The value of Canal+ is reduced by 6 billion euros, that of Universal Music by 3.1 billion euros, and the value of USG (studios) and Vivendi Telecom International by 1.3 billion euros each. I would like to repeat this move does not represent any operating loss – it is an accounting loss that has no cash impact whatsoever.

By making this adjustment now in our financial statements . . . we are keeping one step ahead of market expectations. We are also giving ourselves the opportunity to present first quarter 2002 figures that are understandable to all investors.

This will also enable us, in the future, to improve our net income by significantly reducing charges relating to amortization.

These factors allow us to propose to the shareholders' meeting that the dividend for 2001 be maintained at 1 euro per share.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the goodwill write-down was not attributable to a change in accounting but, rather, to the fact that the Company had been overstating goodwill all along, as set forth above in Section V.B.3, *supra*.

182. On April 15, 2002, Defendants caused Vivendi to file a Form 6-K (the "April 15, 2002 6-K") containing a translation of financial information provided to the French financial regulators. In discussing the goodwill impairment of Vivendi's assets, the Form 6-K stated:

> Vivendi Universal reviews the carrying of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable. Measurement of any impairment is based on fair value. In 2001, following the recent market decline, . . . our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest related to Vivendi Environnement). The charge was comprised of €6 billion for CANAL+ Group, €3.1 billion for Universal Music Group, €1.3 billion for Universal Studios Group, €1.3 billion for international Telecoms businesses, €0.6 billion for Vivendi Environnement (net of €0.3 billion minority interest) and €0.3 billion for Internet businesses. Of the total charge, €12.1 billion related to consolidated subsidiaries and €0.8 billion related to investments accounted for using the equity method.

183. The financial statements contained in the April 15, 2002 6-K indicated that "[t]otal revenues were €57.4 billion." The revenues generated by Vivendi's "core businesses" were €57.2 billion, which was an increase of 43%. Twenty-seven percent of the revenues was due to the "inclusion of a full twelve-month results of the acquired Seagram's operations in 2001 . . . 4% resulted from the 2001 acquisitions of Maroc Telecom, Houghton Mifflin and MP3.com, and the remaining 12% was generated by a combination of organic growth and the impact of less significant acquisitions and disposals." The April 15, 2002 6-K further stated:

Revenues generated by our Media & Communications businesses increased 107% to €28.1 billion, accounting for 49% of our total revenues compared to 33% in 2000. . . . On a pro forma basis, which includes twelve months of comparable operations both for Seagram and the above 2001 acquisitions, revenues increased 9% to €28.9 billion (10% excluding Universal Studios Group filmed entertainment). Double-digit revenue growth of 24% and 36% respectively, were generated by our Telecom and Internet businesses. Our TV & Film and Publishing businesses generated revenue growth of 8% and 5%, respectively. In our Music business, revenues declined 1%, however, this was a strong performance in a down market.

Revenues generated by our Environnemental Services businesses, at €29.1 billion, increased 11%, 8% of which was generated by organic growth and 3% of which was due to the implementation of the Dalkia-EDF agreement and other acquisitions. . . .

\* \* \*

. . . In the U.S., revenues increased 81% to €12.7 billion.

184. In discussing Vivendi's operating income, the April 15, 2002 6-K noted that operating income had "more than" doubled to €3.8 billion, an increase of 145% in Vivendi's "core businesses." The Media & Communications businesses generated €2.2 billion in operating income "before holding and corporate expenses." The 2001 €2.2 billion operating income was an extraordinary increase from €174 million in 2000. Environnemental Services' operating income increased 24% to €2 billion.

185. On April 24, 2002, Vivendi filed a Form 6-K (the "April 24, 2002 6-K") announcing its "strong" first quarter 2002 Media & Communications results. Vivendi reported a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations." The release, issued in New York and filed on a Form 6-K, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros." The release also reported Media & Communications' "revenue organic growth of 13% to 6.8 billion euros; strong

EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros." Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter. In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.

* * *

> In a difficult environment, Vivendi Universal's businesses gained market share. Cash management improved dramatically. Finally, the revenue and cost synergies achieved in the quarter were significant. Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal+ and Internet operations.

186. On April 30, 2002, Vivendi filed a Form 6-K (the "April 30, 2002 6-K") announcing purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion. The release, issued in New York and filed on a Form 6-K, also reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization. In the release, Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders. In the first quarter of 2002, both Media & Communications and Vivendi Environnement delivered their targets.

> The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.

> In a very difficult economic environment, characterized by many market uncertainties, Vivendi Universal's global businesses gained market share. In addition, strong improvement was achieved in cash

management, debt reduction, synergies, management development
and revenue growth.

187. The April 30, 2002 6-K further touted the Company's allegedly

strong cash flow position:

> On a pro forma basis, excluding Vivendi Universal's publishing
> businesses to be disposed of (including the B-to-B and Health
> businesses whose sale is expected to be completed in the second
> quarter), Media & Communications reported:
>
> A strong surge of operational free cash flow, up 159% to 1.4 billion
> euros, well ahead of expectations;
>
> Strong operating results in the first quarter: revenue organic growth
> of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion
> euros; and solid operating income growth, up 37% to 408 million
> euros. All were significantly ahead of budget.

188. The April 4, 2002 6-K, the April 15, 2002 6-K, the April 24, 2002 6-K and the April

30, 2002 60K contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because, *inter alia*,

the Company was engaged in improper accounting practices that had the effect of materially

overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a)

failing to timely write down overvalued assets from previous corporate investments and

acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc

Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating

the Company's revenue from certain multi-year contracts. In addition, these statements

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading because Defendants failed to disclose

that the Company was suffering from a liquidity crisis (as particularized in Section V.C above)

and that Vivendi would need to restructure its debt obligations in order to remain solvent and

avoid bankruptcy.

189. On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3 --

the lowest investment guide. According to Moody's, the ratings downgrade reflected Moody's

concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as

planned."

190. That same day, Vivendi issued a press release, filed on a Form 6-K, criticizing

Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into
> consideration the currently poor market conditions and the fact that
> the agency does not take into account immediately the whole of the
> debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines. In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> meet its operating targets for 2002, as proved by its first-quarter
> results. The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi's "confidence" in its ability to meet its targets for 2002 was based

on the accounting improprieties discussed above in Section V.B, *supra*, and on their continued

concealment of the Company's burgeoning liquidity crisis discussed above in Section V.C,

*supra*.

191. On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December

31, 2001 (the "2001 Form 20-F"). The 2001 Form 20-F reported total revenues of €57.4 billion

in 2001, which was an increase of 43% over 2000.  Vivendi's Media & Communications

- 81 -

business's revenues increased 107% to €28.1 billion over 2000, accounting for 49% of its total revenues. The Environmental Services businesses generated €29.1 billion, an increase of 11% over 2000. In discussing 2001 financial results versus the 2000 results, Vivendi reported that "EBITDA more than doubled to €2.3 billion and operating income almost tripled to €1.3 billion." Excluding Maroc Telecom's results, "revenue growth was 26%, EBITDA increased 56% and operating income increased 103%." In discussing 2000 financial results versus 1999 results, Defendants reported that "EBITDA grew 164% to €1.3 billion and operating income of €486 million was earned compared to an operating loss of €60 million."

192. According to the 2001 Form 20-F, Vivendi's total operating income "more than doubled to €3.8 billion." The Media & Communications businesses "generated operating income before holding and corporate expenses of €2.2 billion in 2001." Environmental Services' operating income increased 24% to €2 billion.

193. Vivendi listed its liquidity and capital resources at December 31, 2001 as follows:

> €41.8 billion of debt, €4.7 billion of cash and cash equivalents and €36.7 billion of shareholders equity compared to €38.8 billion of debt, €3.3 billion of cash and equivalents and €65.7 billion of shareholders equity at December 31, 2000.

194. The Consolidated Balance Sheet listed cash at €4.7 billion and €3.2 billion as of December 31, 2001 and December 31, 2000, respectively. Net cash provided by operating activities was presented in the Consolidated Statement of Cash Flows as being €4.5 billion and €2.5 billion as of December 31, 2001 and December 31, 2000, respectively.

195. In discussing goodwill, Defendants stated:

> Recurring goodwill amortization increased to almost €1.7 billion, primarily due to the inclusion of a full twelve-months of goodwill amortization related to the merger with Seagram and Canal Plus. Additionally, as previously discussed, our 2001 annual review for impairment of the carrying value of long lived-assets resulted in a non-recurring, non-cash charge of €12.9 billion to goodwill

amortization. The impact of the charge on future results will be to reduce goodwill amortization by approximately €380 million per year.

196. Defendants also reported cash flow in the 2001 Form 20-F as follows:

Net Cash Flow from Operating Activities -- Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecom, Publishing and Environmental Services businesses.

Net Cash Flow from Investing Activities -- Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

Net Cash Flow from Financing Activities -- In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €59 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7

billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €03.8 billion.

197. In discussing the Maroc and Cegetel consolidation in Footnote 11 to the

Consolidated Financial Statements, Defendants reported:

> [Cegetel and Maroc are] consolidated because, through a shareholders' agreement, Vivendi Universal has a majority of the shareholder voting rights and no other shareholder or groups of shareholders exercise substantive participating rights, which would allow them to veto or block decisions taken by Vivendi Universal.

198. In reporting on its investment into Elektrim SA, Defendants disclosed only that

Vivendi had entered into an Investment Agreement with Elektrim SA, acquiring 49% of

Elektrim. It further stated:

> In March 2002, Vivendi Universal announced that it had signed a non-binding Memorandum of Understanding with a group financial investors led by Citigroup Investments to sell its 49% interest in Elektrim Telekomunikacja. As part of the agreement, Vivendi Universal will retain a minority interest in the Citigroup-led consortium and will be granted a put option and the investors a call option on this interest. The exercise of the two options will ensure that Vivendi Universal is able to completely withdraw from its investment in Elektrim Telekomunikacja in due course

199. In discussing Vivendi's accounting policies, Defendants again stated that Vivendi

recognized revenues from the sale of recorded music, "net of a provision for estimated returns

and allowances, . . . upon shipment to third parties" and recognized revenues in Environnemental

Services when services were provided, stating:

> Amounts billed and collected prior to services being performed are included in deferred revenues. Fees incurred to obtain a contract and paid upfront are capitalized and amortized on a straight-line basis over the duration of the contract. Revenues from long-term contracts involving a substantial construction component are recorded on the percentage-of-completion basis.

- 84 -

200. For the reasons set forth in greater detail in Section V.B, *supra*, Vivendi's historical financial statements and balance sheets contained in Vivendi's 2001 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company (a) failed to report pro forma financial results properly, improperly consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership), (b) failed timely to write down impaired goodwill from previous corporate investments and acquisitions, including Canal+,(c) overstated the Company's revenue from its Environnemental division on certain multi-year contracts in violation of GAAP and (d) failed to adhere to the accounting policies described in its SEC filings.  In addition, the 2001 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as set forth above at Section V.C.

201. Defendants further attempted to address concerns about debt levels by issuing a press release on May 30, 2002, subsequently filed on a Form 6-K (collectively, the "May 30, 2002 6-K").  The May 30, 2002 6-K disclosed that Vivendi had negotiated some debt relief by obtaining an "agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level."  This action decoupled Vivendi's bank credit lines from rating agencies' decisions.  Investors were further reassured that "the Company has no reason to anticipate or fear any further deterioration in its credit rating."  The May 30, 2002 6-K further stated:

> Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros. Also, its use of commercial paper is limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.

> This cash situation, which, the Company believes, is comfortable –
> even assuming an extremely pessimistic market – will enable the
> Company to continue its debt reduction program with confidence and
> with a view to creating the best possible value for its shareholders.

202. The May 30, 2002 6-K contained untrue statements of material fact and omitted to

state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi was facing a liquidity crisis, as discussed

above in Section V.C. Unbeknownst to investors, Vivendi's cash situation was dire and a further

deterioration in its credit rating was all but certain. Defendants were offering false reassurances

that had their intended effect – on May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

203. On June 11, 2002, Defendants caused Vivendi to file a Form 6-K (the "June 11,

2002 6-K") containing Vivendi's first quarter 2002 unaudited consolidated financial results

reporting numbers in line with its April 30, 2002 6-K, discussed above at paragraph 184.

204. The statements contained in the June 11, 2002 6-K contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading for the same reasons the statements in the April 30, 2002 6-K

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading, discussed above at paragraph 186.

205. Defendants continued their efforts to counteract the stream of bad news. On June

25, 2002, Vivendi issued a press release (and filed a Form 6-K) (collectively, the "June 25, 2002

6-K") titled "Vivendi Universal to Lower Debt by €4 billion in 2002," reiterating the positive

steps it had taken to reduce debt and announcing that the Company's cash position was not

precarious.

206. The statement in the June 25, 20-2 6-K that the Company's cash position was not

precarious contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth above at Section V.C.

207. On June 26, 2002, Vivendi issued yet another press release and Form 6-K (collectively, the "June 26, 2002 6-K") outlining additional details about Vivendi's "deleveraging and liquidity." The June 26, 2002 6-K first outlined that "[a]ccording to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.9 billion under French GAAP)." The June 26, 2002 6-K stated that "[t]he main factors that will impact debt under U.S. practices in the second quarter were or will be [cash inflows and cash outflows]."

208. Further, the June 26, 2002 6-K stated that Vivendi's new debt target was €15 billion by December 31, 2002, stating that "[t]his target represents a ratio of debt to estimated 2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both U.S. and French accounting standards. Using 'proportional' levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA." According to the press release, the lowered debt target, "which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year."

209. The June 26, 2002 6-K also lauded Vivendi's high levels of available credit, stating that "[a]t this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion." This 6-K extolled Vivendi's strong free cash flow, stating:

> Owing to its strong free cash flow, combined with the execution of
> the disposals program and potential bond issues, Vivendi Universal is
> confident of its capacity to meet its anticipated obligations over the
> next 12 months.

210. According to the June 26, 2002 6-K, to aid its cash situation, Vivendi had also

"renegotiated a number of bank clauses, in particular those that placed it in the situation of

certain loans being called if its credit ratings fell below [a certain level]."

211. The June 26, 2002 6-K contained untrue statements of material fact and omitted to

state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that the Company was facing a liquidity crisis, as

discussed above in Section V.C.

212. On June 26, 2002, Messier discussed the Company's debt and liquidity during an

investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in
> the current environment relating to views, view for yourselves, views
> for your accounting and I seen that in those circumstance. The best
> that we can do is to show you that's [sic] there is no hidden liability
> that's you have all the information to come back.

Messier's statement that there was no "hidden liability" contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because he failed to disclose that Vivendi was engaging in improper

accounting, as discussed above at Section V.B, *supra*, and that it was facing a liquidity crisis, as

discussed above at Section V.C, *supra*.

213. As stated in the Securities Class Action Complaint, on June 26, 2002 the Dow Jones

International News reported:

> Chairman Jean-Marie Messier said late Wednesday that he plans to
> stay in charge of the embattled media company despite criticism of
> his strategy and a crumbling share price.

> Messier sought to counter those doubts, opening the call with a
> comment that the company has no hidden, off-balance sheet liabilities
> and adding, "we feel very confident looking to our debt and cash
> analysis with all our commitments of the group for the coming 12
> months."

Messier's statement that there was no "hidden liability" contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because he failed to disclose that Vivendi was engaging in improper

accounting, as discussed above at Section V.B, *supra*, and that it was facing a liquidity crisis, as

discussed above at Section V.C, *supra*.

214. On July 2, 2002, Vivendi's debt was downgraded again amid reports that the

Company was in danger of default. On July 2, 2002, Bloomberg reported that Messier "told

employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden

risks' in the company's accounting." Messier's statement that there were no hidden risks in the

company's accounting contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that Vivendi was engaging in improper accounting, as discussed above at

Section V.B, *supra*, and that it was facing a liquidity crisis, as discussed above at Section V.C,

*supra*.

215. The next day, July 3, 2002, as reported in The Columbian, Messier continued to

defend Vivendi's financial statements: "There are no underestimated liabilities. There are no

overvalued assets," Messier said. "Our results are true, genuine and complete."

216. Messier's contention that the Company's results were "true, genuine and complete"

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading because he failed to disclose that

Vivendi was engaging in improper accounting, as discussed above at Section V.B, *supra*, and

that it was facing a liquidity crisis, as discussed above at Section V.C, *supra*.

## VII.  THE TRUTH EMERGES, CAUSING PLAINTIFFS TO INCUR LOSSES

217. Despite Defendants' attempts to reassure the market that the Company's financial

house was in good order, Moody's lowered the Company's long-term debt rating to Baa3 on

May 3, 2002, putting the securities just one notch above the "junk" status assigned to speculative

investments. Moody's expressly attributed this ratings drop to concerns that the Company might

not be able to reduce its debt load as quickly and comprehensively as it had planned. Vivendi

promptly retaliated, issuing a same-day press release that attacked Moody's downgrade on the

grounds that it purportedly did not consider poor market conditions or the full extent of

Vivendi's debt reduction program. Further, in its Form 6-K issued that same day, Vivendi

attempted to assure the market that Moody's downgrade would not adversely affect the

Company, stating:

> This decision has no impact on Vivendi Universal's cash situation. It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines. In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> meet its operating targets for 2002, as proved by its first-quarter
> results. The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

Despite Defendants' attempt to reassure the market, Vivendi's ADSs dropped $1.74, from

$30.76 to $29.07, in response to Moody's rating downgrade. The Company's ordinary suffered

similar declines, dropping from €33.77 to €31.52.

218. Once the market learned of the potentially catastrophic effects of subsequent credit downgrades, Vivendi's stock plunged lower still. Notably, following May 6, 2002 press accounts revealing that Vivendi could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip any further, the Company's ADSs dropped another $0.81 to $28.26, while its common shares dropped another €0.52 to €31.

219. As the Company's stock continued to plummet, investors called for Messier's head. During a May 29, 2002 meeting in New York, Vivendi's board voted to require a governance committee—led by former Seagrams owner Edgar Bronfman, Jr.—to oversee Messier's leadership.

220. By May 29, 2002, with Vivendi's ADSs now trading in the $29 to $30 range and its common shares trading in the €31 to €33 range in response to concerns about its debt levels, Defendants sought to reassure the financial markets by issuing a press release (also filed on a Form 6-K) reflecting a May 29, 2002 board meeting. The press release stated that Vivendi's board had "carried out a detailed examination of Vivendi Universal's operating and financial targets for 2002." According to the press release, the board stated that their strategy was "based on the active continuation of the debt reduction program and the internal growth of the company's businesses." Messier was quoted as follows:

> Our Board of Directors and management are proceeding together, deliberately and decisively, to execute a plan that, in meeting our financial targets and operating objectives, will deliver increased value and solid growth to our Company. I look forward to the recommendations of our newly created governance committee, which, I believe, will have an added contribution by continuing to improve the structures and procedures that insure an absolute and impartial focus on the Board's fiduciary duty to stakeholders.

221. While the Company sought to assure investors that it was not facing a liquidity crisis, rumors that Vivendi was in danger of default on its credit facilities persisted. On July 2,

2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's

ADSs to plummet nearly 21%, falling from $22.45 to $17.76, while its common shares fell more

than 25%, from €23.90 to €17.80. In fact, the Company's shares plunged so fast that the Paris

Bourse repeatedly suspended trading in the embattled conglomerate's common shares.

222. Vivendi swiftly ousted Messier the following day, admitting that the Company was

facing a "short-term liquidity issue." Vivendi disclosed that it would be required to repay

creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for

renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7

billion by the end of 2002—an amount they feared could expand to €5.5 billion by the middle of

2003 if the Company failed quickly to secure new multibillion-euro lines of credit. These

announcements caused the Company's ADSs and common shares to fall even further, dropping

nearly another 12% on July 3, 2002 from $17.76 to $15.66 and nearly another 22% from €17.80

to €13.90, respectively. All told, the Company's ADSs and common shares fell a stunning 30%

and 41.8%, respectively, in the two days following the second credit rating downgrade.

223. On July 5, 2002, The Globe and Mail Metro, a Canadian newspaper, reported that

Vivendi "finally admitted what its ousted chairman and chief executive officer, Jean-Marie

Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in

danger of a cash crunch." The Globe and Mail Metro further stated:

> Based on a detailed liquidity statement Vivendi put out late
> Wednesday, credit analysts estimate that Vivendi could face a cash
> shortfall of 2.7 billion euros ($2.64 billion U.S.) by the end of the
> year, expanding to as much as 5.5 billion euros by the middle of
> 2003, unless it can quickly secure a new multibillion-euro credit line
> from its lenders.
>
> * * *
>
> In its statement, Vivendi said it must repay 1.8 billion euros this
> month and said the payment would be financed from 2.4 billion euros

in existing cash and credit lines. It also has a 3.8-billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.

This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi--owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets--was "comfortable even in the most pessimistic market hypotheses."

224. On July 10, 2002, The Wall Street Journal reported that the COB had raided Viviendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001. The French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

225. On July 16, 2002, Vivendi announced that Hannezo was relieved of his CFO duties at Vivendi and would stay with Vivendi for six months as an advisor to the new chairman. A July 17, 2002 research report by BNP Paribas Equities stated:

This is no surprise. Guillaume Hannezo was very close to Jean-Marie Messier. *The group's financing packages and strategy were as much his as Messier's.*

(emphasis added).

226. Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come.

227. On August 14, 2002, the Company's new management held a conference call and issued three press releases (filed with the SEC on Forms 6-K) informing the public of just how dire Vivendi's financial situation had become.

228. The first press release memorialized the August 14 conference call. In it, Fourtou stated that:

> In the short term, due to the structure of our debt, we are facing a
> liquidity problem . . . in spite of the value of our assets. That's why
> the first thing I did upon my arrival was to negotiate . . . a new bank
> facility of 1 billion euros. This new money has not yet been used. As
> announced in July, we are presently negotiating a new facility of 3
> billion euros which will include the first 1 billion euros. We have
> reached a framework for agreement with the same seven banks and
> we expect this new facility to be signed by the end of August. This
> will allow Vivendi to buy the time necessary to implement the best
> conditions for the necessary sale of the businesses. . . .

229. The second August 14 press release reported on the August 13, 2002 Board meeting,

announcing that the Board had, among other things, approved a plan to dispose of at least €10

billion worth of assets, including €5 billion in the next nine months; voted to sell Houghton

Mifflin; and authorized the cancellation of 20,865,167 treasury shares linked to certain stock

option plans.

230. The final August 14 press release and Form 6-K announced Vivendi's results for the

first half of 2002, reporting that "[n]et income was a loss of 12.3 billion euros, representing

negative 11.32 euros per basic share, for the first half of 2002." Further, the press release

highlighted the €11 billion goodwill impairment charge and the "financial provisions of 3.4

billion euros" that were recorded at June 30, 2002. Net income was negative €66 million, "or

negative 0.06 euros per basic share in the first half of 2002 compared with positive 0.27 euros

earnings per basic share in the 2001 period." Debt under French GAAP was approximately €35

billion. The Board also laid out its commitment to "raising at least 10 billion euros through asset

sales during the next two years, 5 billion euros of which will be completed during the next 9

months."

231. Reaction was swift and severe. Debt-rating agency Standard & Poor's slashed

Vivendi's long-term corporate credit that same day and warned of a further downgrade if

Vivendi could not secure new funding within a month. Fourtou was quoted by the Associated

Press on August 14, 2002 as stating: "We are facing a liquidity problem, [and I will] try to avoid

any fire sale, but we have negotiations that could be concluded very soon if the price was

lowered."  The news report also stated:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin.  Adding insult to injury, a ratings agency downgraded the company's debt to junk.
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions. In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.

232. In response to these further stunning developments, on August 14, 2002, Vivendi

common shares closed at €11.89, down more than €4 (or approximately 25%) from their close

the previous day.  Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

233.  In the wake of the public admission that the Company was facing a cash crunch,

Vivendi's new management set about the process of raising revenue by jettisoning some of the

conglomerate's major assets.  Media reports indicated that the Company had enough cash to last

only until October 2002, putting Vivendi in a dire position.  To clean up the mess Messier's

costly acquisitions had made of the Company's finances, Vivendi announced an ambitious plan

to shed €16 billion in assets between July 2002 and the end of 2004.  Vivendi's "garage sale"

included the following dispositions:

| Date | Disposition | Price |
|------|-------------|-------|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |

| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal+ Technologies | €191 million |
| April 2003 | Telepiù | €831 million |
| May 2003 | Fixed-line telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal+ Nordic | €48 million |
| February 2004 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | € 169 million |
| June 2004 | Egée and Cédre Towers | €84 million |

| August 2004 | Interests in VIVA Media | €47 million |
| September 2004 | Canal+ Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

In sum, Vivendi dumped over €15 billion in assets between July 2002 and December 2004.

234. Unfortunately for Vivendi, however, its woes were not limited to its bloated balance sheet. On October 30, 2002, Vivendi announced that Paris's public prosecutor's office had opened an investigation into the veracity of the Company's financial disclosures. A few days later, the Company announced that a separate investigation had been opened on the other side of the Atlantic by the United State Attorney's Office for the Southern District of New York. The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

235. The SEC turned up the heat on November 20, 2002, announcing that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation. The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures. In connection with these enforcement efforts, the SEC in September 2003 obtained a court order forcing Vivendi to place in escrow $23 million it had earmarked to pay a severance package Messier negotiated just before his ouster. Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State Court concerning this severance package.

236. On September 15, 2003, the COB—following a fourteen month investigation—announced its conclusion that Vivendi had made false financial disclosures. Among its failures,

the COB found that Vivendi had not disclosed to investors the growing cash problems it faced during the end of Messier's tenure.

237. The United States-based investigations into the crisis engendered by Messier's more than $75 billion acquisition spree came to a stunning conclusion on December 24, 2003. That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million. The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002. Specially, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel.

238. In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal securities laws and barring them from service as officers or directors of any public companies for respective ten and five year periods.

239. Subsequently, the SEC on April 14, 2004 issued an order instituting and simultaneously settling administrative cease and desist proceedings against John Luczycki, Vivendi's former Chief Accounting Officer and Controller. The SEC found that Luczycki had willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, ordering him to cease and desist from violating the antifraud provisions of the federal securities laws and prohibiting him from practicing as an accountant before the SEC for at least three years.

240. While French regulators were slower to bring the Vivendi debacle to a conclusion, it imposed fines of €1 billion each on the Company and Messier on December 8, 2004—marking only the second time the Autorite des marches financiers ("AMF") had come this close to meeting its €1.5 million fine cap.

241. On January 18, 2006, the Company announced plans to discontinue its ADS program, citing concerns over the costs of complying with United States disclosure requirements.

242. In the end, Messier's $75 billion + acquisition spree wreaked havoc on the Company, causing investors in the Company's ADSs to suffer a staggering 85% decline from their Loss Period high of $75.50 and investors in its common shares to suffer an equally stunning 83.9% decline from their Loss Period high of €86.50.

## VIII.  **DEFENDANTS' SCIENTER**

243. Throughout the Loss Period, Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Vivendi's financial condition, as alleged herein.  Many of the misstatements and omissions were the result of intentional deception and intentional violations of GAAP by these Defendants, for the purposes of boosting Vivendi's common share and ADS prices.

244. As set forth elsewhere herein in detail, Messier and Hannezo—by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's materially misleading statements, financial statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Vivendi—were active and culpable participants in the fraudulent scheme alleged herein.  These Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the market and to Plaintiffs.

245. Vivendi is charged with the knowledge possessed by its senior officers, including Messier and Hannezo.

246. Messier's and Hannezo's intentional misconduct included, *inter alia*, authoring and enforcing improper accounting practices and demanding that Vivendi's employees misapply GAAP in order to mask the true liquidity and cash flow situation that Vivendi was suffering.

247. During the Loss Period, Messier and Hannezo signed Vivendi's Forms 20-F, Annual Reports and/or Forms 6-K with knowledge that they falsely represented Vivendi's financial results, or with reckless disregard for their truth or falsity.

248. By mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had it happened, would have nearly eliminated Vivendi's cash and would have deleteriously impacted the Company's ability to borrow more funds from its credit facilities for further acquisitions. In fact, it was that near downgrade that gave Hannezo the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to implore Messier that "all of this not end in shame." *See* ¶¶ 7, 113, *supra*. Nevertheless, Messier chose to not mention the narrowly-averted credit rating downgrade when urging Vivendi's Board of Directors to approve the $10 billion acquisition of USA Network's television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia*, its cash and liquidity situation.

249. Further, as alleged above (¶¶ 83-85), Hannezo knew from a memo dated January 29, 2001, which was prepared shortly after Vivendi acquired Canal+, that the football marketing rights that originally had been believed to be an asset of Canal+ actually belonged to the football league. Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi

took no impairment charge in fiscal 2001, resulting in Vivendi overstating the value of its subsidiary.

250. Additional evidence of Defendants' scienter is the fact that, even though Vivendi claimed in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a €1 per share dividend, Vivendi had had to borrow against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends. Similarly, despite stating in Vivendi's June 26, 2002 press release that it had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

251. The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct. As set forth above, the revelation of Vivendi's truly dismal liquidity situation – including a €19 billion debt burden – caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crumble, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi sorely needed fresh credit. Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure. This cash and liquidity crisis did not happen overnight but, rather, was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the attendant prestige, power and money that would inure to them as the world's leading media and entertainment group. The

extent of the crippling debt load, that Vivendi only first started to publicly admit it was bearing in July 2002, directly belied the financial picture that Defendants presented to the securities markets during the Loss Period.

252. Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's viability going forward was threatened absent a "fire sale of its assets," new management rapidly downsized the Company, sold off major assets and restructured it. *See* ¶ 233, *supra*. Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' hunger for a global empire that they built by means of a fraudulent scheme that misled investors about Vivendi's financial condition, cash and cash flow positions, and liquidity situation. *See* Sections V.B and V.C, *supra*.

253. In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse. In addition, as reported by the Associated Press on December 12, 2002, Hannezo admitted that "2001 was marked by a series of errors, including underestimating the debt problem." Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi invariably would have gone bankrupt "within 10 days."

254. The criminal, civil and regulatory authorities in the United States and in France (including the SEC, the United States Attorney's Office, public prosecutors in Paris and the COB) that investigated and/or commenced proceedings against Defendants all focused on the same question: whether Vivendi, Messier, Hannezo and other Vivendi executives misled investors with overly rosy assessments of the Company's financial health. As a result of its investigation, the SEC found that Vivendi, Messier and Hannezo violated the federal securities

- 102 -

laws, including Section 10(b) of the Exchange Act. The COB concluded that Vivendi had committed irregularities in its financial disclosures and fined Vivendi and Messier €1 million each for making misleading financial disclosures between 2000 and 2002.

255. Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of achieving concrete benefits from their fraudulent conduct. Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its enterprise. In total, Vivendi spent over $75 billion in pursuit of Messier's ambition to create the world's number-one entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities as consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's common shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above. In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further acquisitions depended on Defendants' fraudulent scheme. Vivendi's global reach could not have been achieved *without* Defendants' fraudulent inflation of Vivendi's share price.

256. Messier had an even greater motive for inflating the appearance of Vivendi's financial performance from which he derived concrete benefit by virtue of his fraudulent conduct: his bonus was pegged to Vivendi achieving specific earnings targets. Messier's compensation included a base salary, plus lucrative bonuses based on earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at below market rate. As reported in Vivendi's Form 20-F for fiscal year ended December 31, 2001, Messier received 835,000 stock options and earned $4.8 million in compensation. Of that amount, more than $3 million – two-and-a-half times his salary –

comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%. Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus. Hannezo likewise received extremely lucrative compensation and remuneration that was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

257.   As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Loss Period. Hannezo signed many of the Company's SEC filings and Annual Reports, as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity, which they took, to commit fraud.

258.   Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

259. Messier's and Hannezo's scienter is further evidenced by their clandestine insider trading during the Loss Period. According to an article in The Wall Street Journal dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately need cash. That transaction sent Vivendi's common share and ADS price crashing. Specifically, as reported by The Wall Street Journal, on or about December 28, 2001, just days after writing the "death seat" memo and before the stock sale transaction, Hannezo exercised stock options that earned him a profit of €1.3 million or $1.4 million. An April 11, 2003 article in The Wall Street Journal reported that Vivendi acknowledged that Messier also sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department, also exercised stock options at or around the same time. Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury stock in a €3.3 billion deal. Given their top roles at the Company, Messier and Hannezo and these other executives knew or were in a position to know about that transaction. The market reaction to the sale caused the Company's share price to tumble, but not before Messier, Hannezo and their cronies had the chance to exercise stock options at a profit. It was not until April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares, worth at least €15 million.

## IX.  LOSS CAUSATION

260. At all times relevant hereto, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Plaintiffs. As described herein, during the Loss Period, Defendants made or caused to be made a series of

materially false or misleading statements about Vivendi's business, prospects, operations and financial condition. These material misstatements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all times relevant hereto. Defendants' materially false and misleading statements during the Loss Period resulted in Plaintiffs purchasing or otherwise acquiring the Company's securities at artificially inflated prices. But for Defendants' misrepresentations and fraudulent acts, Plaintiffs would not have purchased Vivendi securities, or would not have purchased them at the artificially inflated prices at which they were trading during the Loss Period. As the truth about Vivendi's actual business, prospects, operations and financial condition was revealed, the inflation caused by these misrepresentations was eliminated from the price of Vivendi's securities, thus causing damages to Plaintiffs.

261. As stated above, Vivendi's stock price began to drop starting on May 3, 2002. On that date, Moody's lowered the Company's long-term debt rating to just one notch above "junk" status, citing concerns about the Company's debt load. Despite Defendants' attempt to reassure the market that Moody's was wrong, in response to Moody's rating downgrade, on May 3, 2002, the Company's ADSs dropped $1.60 down from its close of $30.67 on May 2, 2002 to a close of $29.07 on May 3, 2002. The Company's common shares suffered similar declines, dropping from €33.77 on May 2, 2002 to €31.52 on May 3, 2002.

262. Vivendi's stock continued to plunge as the market learned of the potentially devastating effects subsequent credit downgrades could have on the Company. Notably, following May 6, 2002 press accounts revealing that Vivendi could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip

any further, the Company's ADSs dropped another $0.81 to a closing price on May 6, 2002 of $28.26, while its common shares dropped another €0.52 to a closing price on May 6, 2002 of €31.

263. On July 2, 2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's ADSs to plummet nearly 21%, falling from a closing price on July 1, 2002 of $22.45 to a closing price on July 2, 2002 of $17.76, while its common shares fell more than 25%, from its closing price on July 1, 2002 of €23.90 to a closing price on July 2, 2002 of €17.80. The Company's shares plunged so fast that the Paris Bourse repeatedly suspended trading in Vivendi's common shares.

264. The following day, Vivendi finally disclosed to the public that the Company was facing a "short-term liquidity issue" and ousted Messier. Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002—an amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed quickly to secure new multibillion euro lines of credit. These announcements caused the Company's ADSs and common shares to fall even further, dropping nearly another 12% from its July 2, 2002 close of $17.76 to a July 3, 2002 closing price of $15.66 and nearly another 22% from its July 2, 2002 close of €17.80 to a July 3, 2002 close of €13.90, respectively. In total, the Company's ADSs and common shares fell a stunning 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

265. On July 10, 2002, The Wall Street Journal reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial

disclosures going back to 2001. Notably, the French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

266. Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come. On August 14, 2002, Vivendi announced that it had suffered €12 billion net loss for the first half of 2002 and that it would take a further €11 billion goodwill write down for depreciated assets. Following this announcement, Standard & Poor's dropped Vivendi's debt to junk status. Vivendi's ADSs and common shares cratered, dropping a stunning 23.9% and 25.2%, respectively—falling from $15.33 to $11.66 and from €15.90 to €11.89, respectively—in a single day.

267. Between July 2, 2002 and August 14, 2002, Vivendi lost a stunning €6.4 billion in market capitalization.

268. All told, Messier's more than $75 billion acquisition spree caused investors in the Company's ADSs to suffer a staggering 85% decline from their Loss Period high of $75.50 and investors in its common shares to suffer an equally stunning 83.9% decline from their Loss Period high of €86.50.

## X.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

269. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the allegedly false statements pleaded herein as many of the statements were of historical facts or existing conditions and not identified as forward-looking statements. To the extent certain statements pleaded herein were forward looking, they were not accompanied by specifically tailored, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the forward looking statement.

To the extent that the statutory safe harbor would otherwise apply to any statement pleaded, Defendants are liable for those false forward looking statements because at the time each of those statements was made the speaker actually knew the statement was false.

## XI.  PRESUMPTION OF RELIANCE

270.  In connection with its claims under Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and the common law, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine as the securities purchased by Plaintiffs traded in an open and efficient market.

271.  As set forth above, Defendants made material misrepresentations or failed to disclose material facts.  These misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities.  Plaintiffs purchased the Company's securities between the time that Defendants misrepresented material facts and the time the true facts were disclosed.

272.  The Company's common shares are listed and trade on the Paris Bourse and its ADSs were listed and traded on the NYSE during the Loss Period, both of which are highly efficient markets.

273.  As regulated issuers, Vivendi filed periodic reports with the SEC and other regulators.  In addition, Vivendi was followed by securities analysts who wrote reports that were disseminated to the public.  Further, Vivendi issued press releases that were carried by national and international newswires and thus were publicly available and entered the public marketplace.

274.  As a result, the market for Vivendi securities promptly digested current information from all publicly-available sources and reflected such information in the price of Vivendi's securities.  Under these circumstances, all purchasers of Vivendi's securities suffered similar

injury through their purchases of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## XII.  TOLLING OF THE STATUTE OF LIMITATIONS

275. Plaintiffs did not know, and could not reasonably have discovered before—at the earliest—July 2, 2002 that Vivendi's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading. On that date, Vivendi's debt, which had been downgraded to one notch above "junk" status on May 3, 2002, was downgraded for a second time, sparking near-panic selling in Paris. This selling frenzy crushed Vivendi's common share prices, causing the stock to drop 25% to a new 15-year low of €17.80.  Following his July 3, 2002 ouster, Messier continued to deny any wrongdoing, steadfastly maintaining that the Company's financial results were all "true, genuine and complete."

276. These attempts to reassure the market, however, would ultimately prove futile.  On August 14, 2002, Vivendi was at long last forced to reveal its financial woes, announcing that it had suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt.  Jean-Marie Fortou, Messier's successor, flatly admitted, "We are facing a liquidity problem."

277. Prior to—at the earliest—July 2, 2002, the statutes of limitations on Plaintiffs' claims were tolled by Defendants' active and continuing concealment of the falsity of their statements.  Further, the statutes of limitations on Plaintiffs' claims were again tolled beginning on July 18, 2002, due to the filing of a securities class action complaint on that date in *Rosenbaum Partners, L.P. v. Vivendi Universal,* No. 02 Civ. 5571 (now pending as the Securities Class Action).  Plaintiffs were members of the putative class in that action, which asserts claims against Vivendi and Messier pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the

Exchange Act. Those claims arise out of the same facts and circumstances as the claims in this Complaint.

278. By Order dated May 21, 2007, the Court ruled on the plaintiffs' motion for class certification in the Securities Class Action. The Court certified a class of all purchases of Vivendi securities located in United States, England, France and The Netherlands. Accordingly, the statutes of limitations on Plaintiffs' claims remained tolled between July 18, 2002 and May 21, 2007.

279. All of Plaintiffs' claims have been brought within the applicable statutes of limitations, after giving effect to tolling and the relation-back doctrine.

## XIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Section 10(b) of the Exchange Act and
Subsections (a), (b) and (c) of Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

280. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

281. As described above, Defendants made and disseminated numerous false and misleading statements that were directly attributable to them. Defendants were provided with or had unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

282. As described above, Defendants carried out a fraudulent scheme and course of conduct and/or business that was intended to and did as alleged herein: (i) deceive Plaintiffs; (ii) artificially inflate and maintain the market price of Vivendi securities; and (iii) cause

Plaintiffs to purchase Vivendi securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein, which operated as fraud and deceit upon Plaintiffs as purchasers of Vivendi securities.

283. As alleged above, Defendants acted with scienter in that they knew or were reckless in not knowing that Vivendi's press releases, public statements reported in news articles, investor conferences and analyst reports, Annual Reports, Forms 20-F, Forms 6-K, Registration Statement and documents filed with the COB during the Loss Period referenced above, as well as Defendants' own public statements set forth herein, were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to the investing public, including Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of federal securities laws.

284. As a direct and proximate result of Defendants' wrongful conduct in violation of Section 10(b) and Rule 10b-5, the market prices of Vivendi common shares purchased by Plaintiffs were artificially inflated. In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market, Plaintiffs purchased Vivendi securities at artificially inflated prices.

285. Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired their Vivendi securities at all, or would have done so only at substantially lower prices.

286. Plaintiffs were substantially damaged as a result of their purchases of Vivendi securities at artificially inflated prices and the subsequent decline in price of those securities when the fraud was disclosed.

### SECOND CLAIM FOR RELIEF
### Violation of Section 18 of the Exchange Act
### (Against All Defendants)

287. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiffs do not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 42, 44, 45, 46, 55, 68, 121, 243-259, and 281-286. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

288. This claim is asserted against all Defendants for violation of Section 18 of the Exchange Act.

289. As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Vivendi, including the Company's filings on Form 20-F during the Loss Period.

290. In connection with the purchase of the Company's shares, Plaintiffs and/or their agents specifically read and relied upon the Company's SEC filings, including the Company's filings on Form 20-F during the Loss Period.

291. Specifically, Plaintiffs read and relied on the Company's financial statements in those filings and other statements regarding Vivendi's business operation and financial results, including its debt load and cash flow. Plaintiffs further relied on the Company's statements in those filings as being materially complete and as not omitting material information, including information about the Company's financial condition. Plaintiffs and/or their agents relied on these SEC filings not knowing that they were false and misleading

292. The reliance by Plaintiffs and/or their agents was reasonable.

293. When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of the Company's stock

294. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their purchases of the Company's stock.

295. By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

### THIRD CLAIM FOR RELIEF
### Violation of Section 20(a) of the Exchange Act
### (Against Defendants Messier and Hannezo)

296. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

297. Messier and Hannezo, by reason of their executive positions; their direct involvement in the day-to-day operations of Vivendi, including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Vivendi's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent accounting practices that caused the Company's financial statements to be false and misleading, were control persons of Vivendi. As such, Messier and Hannezo had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content and dissemination of the various statements that Plaintiffs contends are false and misleading.

298. As set forth above, Vivendi participated in a fraudulent scheme and course of business or conduct, and issued false and misleading statements as a primary violator of Section 10(b) of the Exchange Act and subsections (a), (b), and (c) of Rule 10b-5 promulgated

- 114 -

thereunder. Additionally, Vivendi violated Section 18 of the Exchange Act by filing materially false statements with the SEC, as set forth above. By virtue of their positions as control persons of Vivendi and their culpable participation in the Company's fraud, Messier and Hannezo are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Vivendi for its primary violations of Sections 10(b) and 18 and Rule 10b-5.

299. As a direct and proximate result of Vivendi's primary violations of the Exchange Act, for which Messier and Hannezo are liable pursuant to Section 20(a), Plaintiffs suffered substantial damages in connection with their purchases of the Company's securities during the Loss Period.

### FOURTH CLAIM FOR RELIEF
### Common Law Fraud
### (Against All Defendants)

300. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

301. Plaintiffs assert this cause of action based on common law principles of fraud.

302. As alleged herein, each Defendant made material misrepresentations, or failed to disclose material facts, to Plaintiffs regarding Vivendi's financial condition.

303. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Vivendi's true financial condition and future business prospects from Plaintiffs and supporting the artificially inflated price of the Company's securities. As demonstrated by Defendants' misstatements of Vivendi's cash and liquidity positions during the Loss Period, Defendants, if they did not have actual

knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

304. The aforesaid misrepresentations and omissions were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs when making investment decisions.

305. The aforesaid misrepresentations and omissions constitute fraud and deceit under applicable law.

306. Plaintiffs reasonably relied upon Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities. Plaintiffs read the Company's press releases, filings on Forms 20-F, and filings of Forms 6-K, including the financial statements contained therein. Plaintiffs relied on those statements as being materially complete, and as not omitting material information. In particular, Plaintiffs read and relied on the line items in the Company's financial statements for cash, liquidity and earnings per share. Plaintiffs' decisions to purchase and hold Vivendi common shares were based, in significant part, on Plaintiffs' analysis of these financial metrics as set forth in the Company's financial statements.

307. At the time Vivendi's securities were purchased and held by Plaintiffs, Plaintiffs did not know of the false and/or misleading statements and omissions. If Plaintiffs had known the true facts, they either would not have purchased Vivendi's securities or would have done so only at substantially lower prices.

308. As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs suffered damages in connection with their purchases and holding of Vivendi's securities.

### FIFTH CLAIM FOR RELIEF
#### Common Law Negligent Misrepresentation
#### (Against All Defendants)

309. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiffs do not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 40, 42, 43, 44, 53, 66, 1119, 241-257, 279-284, 295-297, and 299-306. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

310. This claim is brought by Plaintiffs against Defendants under common law principles of negligence.

311. Defendants made materially false and misleading statements, as set forth above, regarding, *inter alia*, the financial condition and the accounting policies and practices of the Company.

312. Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements and accounting policies and practices during the Loss Period were materially false and misleading.

313. Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Defendant Vivendi. Defendants Vivendi, Messier and Hannezo breached this duty by including in Vivendi's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

314. Plaintiffs, as investors, were entitled to rely upon, and were justified in relying upon, the representations made by Defendants, set forth above, regarding the Company's financial statements, accounting policies and practices, and compliance with GAAP. Plaintiffs relied upon the superior knowledge and expertise of Defendants and justifiably relied to their detriment on Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities.

315. As alleged above, Defendants materially misrepresented Vivendi's financial results and its compliance with GAAP throughout the Loss Period.

316. Plaintiffs had no knowledge of the false and misleading nature of Defendants' statements when purchasing and refraining from selling Vivendi's securities, and believed them to be true. Had Plaintiffs been aware of the true facts, they would either not have purchased Vivendi's securities, or would not have purchased the securities at inflated prices.

317. As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's securities was artificially inflated and Plaintiffs sustained damages in connection with their purchases and holding of Vivendi's securities when the price of the securities declined.

318. Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

319. Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

320. Defendants' scheme to hide Vivendi's liquidity crisis and artificially inflate its share prices through the use of improper accounting methods unjustly enriched Defendants, at Plaintiffs' expense, by artificially inflating the price Plaintiffs paid for Vivendi securities during the Loss Period.

321. Defendants' retention of the unjustly acquired amounts violates the fundamental principles of justice, equity, and good conscience.

322. Accordingly, Defendants should be ordered to return any funds obtained at Plaintiffs' expense as a result of their scheme.

## XIV. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment on their behalf as follows:

1.    Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

2.    Awarding Plaintiffs the right to rescind their Vivendi securities to the extent they continues to hold such securities;

3.    Awarding Plaintiffs on the common law fraud claim asserted above an amount of punitive or exemplary damages in an appropriate amount to accomplish the purposes and aims of such damages, in an amount to be determined at trial under appropriate procedures against Defendants;

4.    Awarding Plaintiffs the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

5.    Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

## XV.  JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: New York, NY
       December 21, 2007

**GRANT & EISENHOFER P.A.**

By: _____
       Stuart M. Grant (SG-8157)
       James J. Sabella (JS-5454)
       Diane Zilka (DZ-9452)
       Christine M. Mackintosh
485 Lexington Avenue
29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

**DIAZ REUS ROLFF & TARG LLP**
Alexander Reus (AR-4674)
100 SE Second Street, Suite 2610
Miami, Florida 33131
Telephone: (786) 235-5000
Facsimile: (786) 235-5005

*Attorneys for Plaintiffs*