UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

This Document Relates To:

03 Civ. 5911
07 Civ. 5742          07 Civ. 7370
07 Civ. 7775          07 Civ. 7776
07 Civ. 7778          07 Civ. 7779
07 Civ. 7863          07 Civ. 7803                    02 Civ. 5571 (RJH) (HBP)
07 Civ. 8208          07 Civ. 8156
07 Civ. 9229          07 Civ. 8830          **MEMORANDUM OPINION AND**
07 Civ. 9593          07 Civ. 10578                    **ORDER**
07 Civ. 10954        07 Civ. 10995
07 Civ. 11092        07 Civ. 11305
07 Civ. 11483        07 Civ. 11484
07 Civ. 11485        07 Civ. 11628
08 Civ. 0024          08 Civ. 0116
08 Civ. 0117          08 Civ. 0418
08 Civ. 1111          08 Civ. 0950
08 Civ. 1973          08 Civ. 1938
08 Civ. 1983          08 Civ. 1974
08 Civ. 1985          08 Civ. 1975

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

Defendants move for partial summary judgment for lack of standing against plaintiffs in

the above-captioned actions.  Defendants argue that all plaintiffs lack constitutional standing

because they have no proprietary interest in the claims they bring or the shares from which the

claims arise.  In addition, defendants argue that certain plaintiffs also lack statutory standing

because they have failed to produce sufficient evidence that they possess authority to sue and

unrestricted investment discretion.  Plaintiffs respond to defendants' constitutional point by

arguing that either they qualify for an exception to the constitutional bar traditionally afforded to

trusts, or they have been or will be assigned the claims by the underlying funds they represent. Plaintiffs respond to defendants' statutory point by asserting that documents they have produced raise a genuine issue of material fact with regard to their authority to sue and unrestricted investment discretion.  In the alternative, should the Court find that plaintiffs do not have standing, plaintiffs request leave to substitute the funds they represent as the real parties in interest under Rule 17 of the Federal Rules of Civil Procedure ("FRCP").  For the reasons stated herein, defendants' motion is granted in part and denied in part.

## BACKGROUND

This is one of three opinions in this matter the Court is issuing today, with the other two providing the Court's decision on defendants' motion for reconsideration of class certification and defendants' motions for summary judgment for failure to prove loss causation.  Plaintiffs' allegations and a more detailed summary of the facts are set out at greater length in the Court's opinion addressing the issue of loss causation, and the Court assumes familiarity with that opinion.  Only the facts relevant to the issue of standing are described here.

This case began as a putative class action against defendant Vivendi Universal S.A. ("Vivendi") and two of its former senior officers, Jean-Marie Messier, and Guillaume Hannezo, for violations of U.S. securities law.  Defendants were alleged to have made various material misrepresentations and omissions concerning Vivendi's liquidity position in 2001 and 2002.  The truth allegedly began to leak into the market in 2002 when Vivendi announced several asset sales, and the credit rating agencies downgraded Vivendi's debt.  An opinion by Judge Baer, later adhered to by this Court on reconsideration, found that Messier and Hannezo's extensive activities in New York City in 2001 and 2002 were sufficient for subject matter jurisdiction and

the application of U.S. law to the dispute.  *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 458 (S.D.N.Y. 2002); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004).

Although Vivendi is a corporation organized under the laws of France, its securities traded on both the New York Stock Exchange ("NYSE") as American Depository Shares ("ADSs") and the Paris Bourse as ordinary shares.  By order dated March 22, 2007, this Court certified a class of Vivendi shareholders from the United States, France, England, and the Netherlands.  *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76 (S.D.N.Y. 2007). Shareholders not from France, England or the Netherlands who purchased on the Bourse were excluded from the class.  Many of these shareholders owned their shares through various funds that pooled the shares with other assets for the purpose of earning a return.  These funds were in turn managed by various entities, and it is these entities (the "Individual Plaintiffs") that have brought suit on behalf of the funds in the above-captioned actions (the "Individual Actions").  By order dated January 7, 2008, the Court consolidated the Individual Actions with the class and related actions by the Liberty Media plaintiffs[1] and GAMCO Investors, Inc. ("GAMCO").  The Court allowed discovery to proceed on an accelerated schedule, and defendants first moved for summary judgment on standing against the Individual Plaintiffs and GAMCO in August 2008.

After plaintiffs had responded to defendants' moving brief but before defendants had filed their reply, the Court of Appeals issued its decision in *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008).  The decision, described in greater detail below, announced a new standard for constitutional standing to bring suit under U.S. securities laws.  Defendants argued in their reply that plaintiffs did not meet this standard.  Individual

---

[1] The Court has since vacated as improvidently granted its earlier order consolidating the Liberty Media plaintiffs. (*See* Tr. of Conference Mar. 3, 2009.)

plaintiffs and GAMCO responded by moving for leave to file sur-replies.  The Court granted plaintiffs' motions and denied defendants' requests for further briefing.

## DISCUSSION

Defendants' motions raise three issues:  (1) whether plaintiffs have standing to sue on behalf of Vivendi shareholders simply by virtue of their special relationship with them; (2) whether post-filing assignments by shareholders operate to give plaintiffs standing; and (3) whether the Court may allow shareholders to substitute for plaintiffs under Rule 17 of the FRCP at this stage in the litigation.  The first issue depends almost entirely on the rule in *Huff*.  The second and third issues depend on the law of standing more generally.

## I.       Standing to Sue

### A.       The Rule and its Exception in *Huff*

"Article III standing consists of three 'irreducible' elements:  (1) *injury-in-fact*, which is a 'concrete particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief."  *Huff*, 549 F.3d at 106-07 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (emphasis in original).  Because plaintiffs purchased Vivendi shares on behalf of their clients, and because it was those clients who suffered losses due to defendants' alleged fraud, defendants' argument focuses on the injury-in-fact requirement.  (Def. Reply Br. Individual Pl. at 5 ("Individual Plaintiffs have not suffered the injury-in-fact required by Article III because they did not purchase Vivendi securities on their own behalf."); Def. Reply Br. GAMCO at 2 ("GAMCO does not and cannot show it has satisfied Article III's injury-in-fact

requirement.").)  The fact that plaintiffs are not the beneficial owners of the securities does not necessarily mean that they lack standing to bring their claims.  Should the evidence show that plaintiffs own the *claims* by virtue of an assignment, there would be little doubt that they have standing.  *See Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 117 (2d Cir. 2002) ("[A] valid and binding assignment of a *claim* (or a portion thereof)—not only the right or ability to bring suit—may confer standing on the assignee.") (emphasis in original).  Absent such a valid assignment, the issue becomes whether plaintiffs occupy some middle ground that grants them standing.

In *Huff*, appellee W.R. Huff Asset Management ("Huff") argued that it occupied just such a middle ground by virtue of its "discretionary authority to make investment decisions for its clients" and possession of its clients' "power of attorney" to bring suit on their behalf.  *Huff*, 549 F.3d at 103.  In fact, the district courts had understand these factors to be sufficient for Huff to qualify as a "purchaser or seller" and therefore to have statutory standing to bring its claims under the securities laws.  *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 98 (S.D.N.Y. 2005); *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 255 (S.D.N.Y.2003).  Presumably, plaintiff Huff concluded that constitutional standing and statutory standing were coextensive in its case.  The Court of Appeals, however, rejected this argument and articulated distinct requirements for Article III standing.

Reasoning from the Supreme Court's recent decision in *Sprint Communications Co. v. APCC Services, Inc.*, 128 S. Ct. 2531 (2008), the Court of Appeals held that "[i]n our view, *Sprint* makes clear that the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim."  *Huff*, 549 F.3d at 108.  Having neither title nor a proprietary interest in its clients' securities, the court concluded that Huff lacked

constitutional standing.  Importantly, the court also considered and rejected the possibility that Huff qualified for one of the "few well-recognized prudential exceptions to the 'injury-in-fact' requirement."  Citing *Kowalski v. Tesmer*, 543 U.S. 125 (2004), the Court of Appeals held that the law permitted "third-party standing" where the plaintiff can demonstrate "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests."  *Huff*, 549 F.3d at 109.  Pursuant to this exception, the law permitted "[t]rustees [to] bring suits to benefit their trusts; guardians ad litem [to] bring suit to benefit their wards; receivers [to] bring suit to benefit their receiverships; assignees in bankruptcy [to] bring suit to benefit bankrupt estates; [and] executors [to] bring suit to benefit testator estates."  *Id.* at 109-10 (quoting *Sprint*, 128 S. Ct. at 2543).  The court rejected the notion of "investment manager standing", holding that the "investment advisor-client relationship is not the type of close relationship courts have recognized as creating a 'prudential exception'" and that there was no barrier to Huff's clients bringing suits themselves.  *Id.* at 110.  Indeed, Huff's clients were sophisticated investors, and some already had filed such suits.  *Id.*

     Some additional context is helpful to understanding *Huff*'s "prudential exception" to the injury-in-fact requirement.  First, given *Huff*'s reference to the "irreducible" elements of Article III standing and the nature of its analysis, this Court assumes that the Court of Appeals was not using the word "prudential" as it is frequently used to distinguish the "judicially self-imposed limits on the exercise of federal jurisdiction" from the constitutional limits that cannot be abrogated by Congress.  *See United Food and Commercial Workers Union Local v. Brown Group*, 517 U.S. 544, 551 (1996).  Without any action by Congress, the courts have permitted certain plaintiffs to bring suit despite not having personally suffered an injury-in-fact, and *Huff*'s exception appears to be of this ilk.  *Compare id.* (noting that under "[t]he modern doctrine of

associational standing", an organization "may sue to address its members' injuries, even without a showing of injury to the association itself") *with Huff*, 549 F.3d at 109 (placing trustees, guardians ad litem, and receivers within its exception).

Second, a comparison of the exception to the rule indicates the importance of the distinction between having title to the claim at issue and having title to the securities from which the claims derive.  In several of the examples cited by *Huff*, the plaintiffs often possess some aspect of title to the underlying assets.  *See* RESTATEMENT (THIRD) OF TRUSTS § 2 cmt. d ("it is usually true . . . that the trustee has legal title [to the trust property]"); NEW YORK JUR. 2D *Receivers* § 1 ("[a] statutory receiver has such power and authority as the statute under which he is created gives him or her, and such a statute may provide for the vesting of title to property in the receiver"); *Reagan v. Ross*, 691 F.2d 81, 83 n.5 (2d Cir. 1982) ("the general rule is that the bankruptcy trustee takes title to all the property of the bankrupt") (citations omitted); *but see* RESTATEMENT (THIRD) OF TRUSTS § 7 cmt. a (whereas "[a] trustee . . . has title to the trust property[,] a guardian of property does not have title to the property, but has only certain powers and duties to deal therewith for the benefit of the ward, the ward having title to the property"). Nevertheless, courts often do not speak of these plaintiffs as "owning" claims arising from the assets to which they have title because, owing to the special nature of their relationship to the assets' beneficial owners, the law grants these plaintiffs the right—if not imposes on them the duty—to bring these claims.  *See* RESTATEMENT (SECOND) OF TRUSTS § 280 ("The trustee can maintain such actions at law and equity or other proceedings against a third person as he could maintain if he held the trust property free of trust."); NEW YORK JUR. 2D *Receivers* § 86 ("The permanent receiver of a corporation has the power to sue in his or her own name or otherwise for the recovery of the property, debts, and causes of action of the corporation."); NEW YORK JUR.

2D *Infants* § 129 (guardian may bring claims covering the real estate of the ward).  Accordingly, whereas the material issue under the *Huff* rule is alternatively whether the plaintiff has suffered the claimed injury or been assigned the claim, the material issue under the *Huff* exception is whether the special relationship between plaintiff and the beneficial owner of the claim is such that the right to bring the claim inures to the plaintiff by operation of law.

Third, the two requirements for the *Huff* exception to apply define the outer bounds of the special relationship between plaintiffs and the beneficial owners of the claims.  The legal principles that assign claims to plaintiffs in the examples above generally operate in conjunction with others to bar the beneficial owners from bringing those claims.  *See* RESTATEMENT (SECOND) OF TRUSTS § 281 ("Where the trustee could maintain an action at law or suit in equity or other proceeding against a third person if the trustee held the trust property free of trust, the beneficiary cannot maintain an action at law against the third person . . . [except when] the beneficiary is in possession of the subject matter of the trust . . . ."); NEW YORK JUR. 2D *Parties* § 8 (providing that infants, the mentally ill, and the deceased cannot bring suit).  Hence, the twofold requirement that the relationship be "close" and that there be "a barrier to the injured party's ability to assert its own interests."  *Huff*, 549 F.3d at 110.

### B.   Application of the *Huff* Exception

Defendants argue that most of the Individual Plaintiffs lack constitutional standing to bring their claims because they do not fall under the exception, or, in the alternative, because they have not produced evidence of a valid assignment of claims by those who have standing. Individual Plaintiffs respond by arguing that they either fall under the exception or have received assignments from legal entities that fall under the exception.[2,3]  Regarding the *Huff* exception,

---

[2] The issue of assignment if addressed *infra* at 19-24.

Individual Plaintiffs argue at length in their sur-reply that certain of them function as trusts—for some or all the funds they represent—under laws of the Germany (AGI Kap, Bayern, BWI, Cominvest, DeAM, Deka Investment, Deka Fundmaster, FT, Helaba, Inka, LBB-Invest, MEAG KAG, Nordcon, Oppenheim, PIKAG, Universal, and WestLB), Luxembourg (Deka Lux, FT-Lux, and OPAM), France (AGF), Belgium (KBC), Sweden (Nordea Fonder and SEB AB), and Austria (Raiffeisen and AGF).[4]  Those Individual Plaintiffs who represent Danish investment funds (Danske and Nordea Invest) argue separately that the unique structure of these funds under Danish law merits a separate exception.[5]

*The German Funds*

The parties draw the Court's attention to three types of collective investment vehicles governed by German law:  the "trust form" ("Treuhandlösung") and "joint ownership form" ("Miteigentumslösung") of investment vehicles, both of which are created by contract between investors and an investment company, and the "statutory form", which is governed by corporate law.  (Stürner Decl. ¶ 4; Hess Decl. ¶ 11 & n.12.)  It appears from plaintiffs' sur-reply, however,

---

[3] In a footnote, plaintiffs suggest that they might yet satisfy the *Huff* rule because "while the funds' investors indisputably are the beneficial owners of the assets of the funds, the Plaintiffs exercise powers associated with legal ownership under American law, including the power to dispose of the assets, and the power to institute a lawsuit to recover damages to the funds."  (Individual Pl. Sur-Reply Br. at 6 n.4.)  To reject plaintiffs' suggestion, the Court need do no more than observe that the plaintiff in *Huff* possessed these "powers associated with legal ownership" and the Court of Appeals nevertheless found that it lacked standing.

[4] The Court adopts the naming convention used by Individual Plaintiffs in their Sur-Reply Brief.

[5] In their reply brief, Defendants concede that Deka Ireland has produced documents sufficient to demonstrate its standing to bring claims on behalf of three funds, presumably under the *Huff* exception.  (Def. Reply Br. Individual Pl. at 3 n.4 ("Individual Plaintiffs, with the exception of Deka Ireland . . . fail to prove standing.").)  Defendants nevertheless argue that summary judgment should be granted against Deka Ireland because these documents were produced "months after the close of fact discovery and Defendants' summary judgment submission."  *Id.* at 3-4 n.4. Rule 37(c)(1) of the Federal Rules of Civil Procedure permits the Court to bar the use of evidence in a motion when that evidence was untimely produced, provided that the untimely production was neither "substantially justified" or "harmless".  The Court has examined the correspondence between the parties and concludes that plaintiffs' untimely production was "substantially justified" due to the accelerated pace at which discovery was conducted, its size and scope, and the international nature of production.  Accordingly, the Court denies defendants' motion with regard to Deka Ireland.

that the funds at issue in this case have adopted the joint ownership form.  (Individual Pl. Sur-Reply Br. at 7.)  In the joint ownership form, the investment company "creates and manages one or more investment funds, which each are not a legal entity of their own . . . ."  (Stürner Decl. ¶ 4.)  Investors' rights in the funds are represented by special certificates or "investment fund units" that entitle investors to pro rata ownership in the assets held by the fund.  (*Id*.)  Investors do not manage or exercise any control over the fund assets, however, their ownership rights being limited to transferring or redeeming their investment fund units.  (*Id*. ¶ 6 ("The investors can only transfer or redeem the investment fund units, they cannot dispose of any of the fund's assets."); *see also id*. Ex. C, Investment Companies Act § 11 ("Every unit-holder may demand that, against surrender of the unit certificates, his share of the investment fund be paid to him therefrom; details shall be provided in the fund rules.").  Further, "[t]he investment company has the right to dispose of the assets belonging to an investment fund and to exercise all rights attached thereto in its own name and in accordance with this act and the fund rules."  (*Id*. Ex. C, Investment Companies Act § 9.)  Investment companies are constrained in their investment decisions by other statutory provisions and the fund rules created by contract.  (*Id*.; Hess Decl. ¶ 7.)  By operation of law, however, investment companies have the exclusive right to bring legal claims, in their own name, for damage to the funds' assets.  (Stürner Decl. ¶ 10; *id*. Ex. C, Investment Companies Act § 9; *see also* Stürner Supp. Decl. ¶ 4 (concluding that while "there is no [German] court decision dealing with this question", statutory provisions make clear that claims for damages belong to the investment company).)

Defendants challenge plaintiffs' standing to sue as German investment companies ("KAGs") on behalf of their funds alternatively because they do not possess title to the claims or because they have failed to produce the documents constituting the "fund rules" that may or may

not constrain the KAGs' investment authority.  (Def. Reply Br. Individual Pl. at 13-14; Def. Br. Individual Pl. at 7-9, 12, 20-23, 25-27, 29, 33.)  With regard to plaintiffs' defective document production, defendants argue that for each fund, two documents establish its authority to manage, the Allgemeine Vertragsbedingungen ("AVB"), containing the general contractual conditions, and the Besondere Vertragsbedingungen ("BVB"), containing the specific contractual conditions for that fund.  (Def. 56.1 Statement ¶ 81; Hess Decl. ¶ 4.)

As an initial matter, the Court concludes that plaintiffs who are KAGs qualify under the *Huff* exception.  Investors have no control over the assets held by the funds and the funds are not legal entities that could bring suit.  Investors also appear to have no authority, as would a board of directors, to fire the KAGs; they may merely demand redemption for their investment units should they not like the KAG's management.  Moreover, the Court is persuaded by plaintiffs' expert that statutory authority, independent of the fund rules, grants the KAGs exclusive authority to sue on behalf of the funds.  Accordingly, the Court finds a close relationship between the KAGs and the funds investors as well as a barrier to the investors bringing suit, thereby bringing plaintiffs within the *Huff* exception.

The Court also rejects defendants' contention that there is something magic about the AVBs and the BVBs that requires summary judgment be granted should plaintiffs fail to produce a pair for each fund.  Even if this was required, plaintiffs have produced sufficient documentary evidence and deposition testimony to raise a genuine issue of material fact with regard to whether plaintiffs are in fact the KAGs for the funds at issue.  (*See* Individual Pl. 56.1 Resp. ¶ 33 (AGI Kap); *id*. ¶ 38 (Bayern); *id*. ¶¶ 43-49 (BWI); *id*. ¶¶ 53-57 (Cominvest); *id*. ¶¶ 73-76 (DeAM); *id*. ¶¶ 82-84 (Deka); *id*. ¶¶ 1-5 (FT Additional Facts); *id*. ¶¶ 1-5 (Helaba Additional Facts); *id*. ¶¶ 1-5 (Inka Additional Facts); *id*. ¶¶ 1-5 (MEAG KAG Additional Facts); *id*. ¶¶ 1-5

(Nordcon Additional Facts); *id*. ¶¶ 1-12, 15-20 (Oppenheim Additional Facts); *id*. ¶¶ 1-11
(PIKAG Additional Facts); *id*. ¶¶ 1-6 (Universal Additional Facts); *id*. ¶¶ 1-6 (WestLB
Additional Facts).

*The Luxembourgian Funds*

At issue are two types of collective investment under Luxembourgian law:  (a) the
contractual type akin to mutual funds—"fonds common de placement" or FCPs—and (b) the
corporate type—with those having a variable share capital known as "société d'investissement à
capital variable" or SICAVs.  Legal experts from both sides of the debate agree that FCPs "do
not have legal personality and thus cannot act on their own."  (Leermakers Decl. ¶ 4.10; Kremer
Decl. ¶ 15.)  Designated management companies act for the FCPs, with each "act[ing] in its own
name . . . indicat[ing] that it is acting on behalf of the FCP."  (Leermakers Decl. ¶ 4.10.)  The
management companies have exclusive rights to manage the funds and bring legal actions
against third parties.  (*Id*. ¶ 4.16 ("[The management company] may, as legal representative of
the fund, start legal proceedings on behalf of the fund and seek damages for the suffered losses.
However, the management company's right to bring suit on behalf of an FCP is not based upon a
transfer of ownership interest in the property held in the investment fund, but instead [upon] its
status as the legal representative of the fund under Luxembourg law."); Kremer Decl. ¶ 20 ("No
other party has the power to enter into agreements or take legal actions on behalf of the FCP,
unless such other party is specifically authorized by the management company.").)  SICAVs are
essentially corporations or limited partnerships that are governed by corporate law.  (Kremer
Decl. ¶¶ 24-25.)  They have their own legal personality, and corporate powers are vested in a

board of directors (or general partner) much like corporate entities (or partnerships) in the United States.  (*Id*. ¶¶ 26-28.)

The Court concludes that the FCP management companies and the SICAVs themselves have standing to bring suit on behalf of their investors under the *Huff* exception.  The relationship between a management company and an FCP appears to be similar to that of trustee to beneficiary, and absent legal personality, both sides' legal experts agree that neither the FCPs or their investors could bring suit on their own.  SICAVs appear to be sufficiently similar to corporations and limited partnerships to justify allowing them to bring suit.  While shareholders may sue derivatively on behalf of U.S. corporations in which they own shares, it goes without saying that the corporations themselves have standing to sue third parties for damage to corporate assets.

Defendants nevertheless challenge plaintiffs' standing to sue on behalf of these Luxembourgian entities because they have failed to produce valid documentation substantiating their status or have delegated their responsibilities—and therefore presumably their standing—to other entities.  However, there appears to be, at the very least, a genuine dispute of material fact over whether Deka and FT are in fact the Management Companies for the Luxembourgian funds. (*See* Individual Pl. 56.1 Counterstatement "Deka" ¶¶ 13, 15.; *id*. "FT and FT-Lux" ¶¶ 11, 13.) Given the agreements of the parties' legal experts with regard to management companies' status with regard to their funds, the Court concludes that there is a genuine issue of material fact as to whether Deka and FT-Lux satisfy the *Huff* exception.[6]

---

[6] With regard to OPAM, defendants admit that plaintiff is the management company for eight of the nine funds for which it is suing, but argue that standing should be denied because it lacks an ownership interest in these funds. (Def. Reply Br. Individual Pl. at 38 n.4.)  For the ninth fund, defendants argue that the funds' assignment and ratification was defective because it was not made until October 23, 2008.  Because an ownership interest is not essential for standing under the *Huff* exception, the Court denies summary judgment with respect to those eight funds.

*The French Funds*

French law governing the relevant funds is in all material respects identical to Luxembourgian law.  The two relevant investor funds are identically named FCPs and SICAVs. (Drummond Decl. ¶ 5; Boucobza Decl. at 8.)  Like their Luxembourgian counterparts, FCPs have no legal personality and require a management company to take virtually all actions on their behalf, including filing lawsuits, while SICAVs have a legal personality and ultimate control over the authority delegated or assigned to management companies.  (Drummond Decl. ¶¶ 5-6; Boucobza Decl. at 8-10.)  FCPs retain ownership of the funds assets and operate similar to trusts, while SICAVs have the equivalent of shareholders and are governed by corporate law. (*Id.*)  Accordingly, the Court concludes that as with their Luxembourgian equivalents, the FCP management companies and the SICAVs themselves have standing to bring suit on behalf of their investors under the *Huff* exception.

Defendants challenge AGF and Fortis's standing to bring suit on behalf of various French funds.  For those funds that are FCPs, defendants do not challenge the fact that AGF is their management company, arguing only that AGF does not have title to its claims and therefore fails the test in *Huff*.  (Def. Reply Br. Individual Pl. at 30 n.34.)  Because AGF satisfies the *Huff* exception for these funds, the Court finds that AGF has standing to pursue claims for these funds.  To the extent AGF is still pursuing claims with regard to five SICAVs for whom AGF acts as management company, (*id.* at 23-24), the Court finds that it is these SICAVs who have standing to sue.

*The Belgian Funds*

Although the parties' experts opine on a variety of Belgian investment entities, the legal status of only one—unincorporated mutual funds—is at issue, and the parties agree that these entities are legally equivalent to French and Luxembourgian FCPs.  (Jakhian Decl. ¶ 5; Störme Decl. at 3, 12.)  Defendants argue that KBC lacks standing to sue on behalf of six Belgian funds. Plaintiffs respond by conceding that KBC lacks standing with respect to five of the six funds and that it intends to obtain assignments.  (Individual Pl. Sur-Reply Br. at 9 n.9.)  With respect to the sixth, Bankaandelenport.Eurostoxx-50 Total, plaintiffs assert that KBC was the management company of the fund, a mutual fund/FCP, and therefore that it has standing to bring suit.  (*Id.*) Defendants reply by arguing that the law cited by plaintiffs' expert was not operative prior to 2004, and that, in any event, plaintiffs have not produced the contracts governing KBC's authority, which could require KBC to name the investors on whose behalf it sues.  (Def. Reply Br. Individual Pl. at 26 n.9, 49; Jakhian Decl. ¶ 7.1.)  Plaintiffs' expert does, however, point to case law prior to 2004, indicating that the statute was merely a codification, if not a revision of an earlier statute, with the same meaning.  (Störme Decl. at 12-13.)  Moreover, the Court concludes that whether or not KBC was required to also name its investors does not bear on whether KBC satisfies the *Huff* exception, and concludes that KBC has standing to sue on behalf of Bankaandelenport.Eurostoxx-50 Total.

Defendants also challenge whether AGF has standing to sue on behalf of three Belgian funds from whom it received assignments because plaintiffs have offered no evidence that the assignor, Allianz Belgium, S.A., actually owns the funds.  Plaintiffs have, however, produced a declaration testifying to such ownership, and despite defendants' accusation that the declaration

is "self-serving" and "uncorroborated", (Def. Reply Br. Individual Pl. at 31), the Court concludes that it is sufficient to create a genuine issue of material fact with respect to standing.

*The Swedish Funds*

Defendants challenge only SEB AB's right to sue on behalf of a single fund governed by Swedish law.  (Def. Br. Individual Pl. at 31.)  The Court need look no further than defendants' own expert to conclude that SEB AB, the undisputed management company for the fund, has standing to bring its claims.  Defendants' expert concedes that the fund "does not have standing before a court of law, as it is not a legal person", that the management company "shall represent the [investors in the fund] in respect to all issues", and that "the Swedish management company shall act in its own name stating the fund's generic name."  (Millqvist Decl. at 2, 4.)  Defendants' expert further concedes that in writing the law governing the funds, the legislature intended to "import the main characteristics of the Common law trust."  (*Id*. at 3.)  In light of these statements, the court concludes that SEB AB has standing to sue on behalf of the Sweedish fund because it qualifies for the *Huff* exception.

*The Austrian Funds*

Because defendants do not appear to have produced a legal expert to opine on Austrian law, the Court relies on plaintiffs' expert.  An Austrian investment fund has "no legal personality of its own."  (Karollus Decl. ¶ 13.)  "It is administered by a management company" and "[o]nly the management company is entitled to act for the account of a fund."  (*Id*.)  Furthermore, "in order for the management company to be entitled to pursue claims for the account of the fund, there is no need for an explicit consent by the fund's owners . . . or a particular power of attorney

. . . .  Nor is it necessary that the power to file claims is mentioned in the fund rules.  The power

of the management company to file claims for the account of the fund is directly derived from

and based on the statute." (*Id.* ¶ 19.)  From these and other statements in plaintiffs' expert's

declaration, the Court concludes that the relationship between Austrian funds and their

management companies qualifies for the *Huff* exception, and therefore that the management

companies have standing to pursue the funds' claims.

Defendants challenge Raiffeisen and AGF's standing to bring claims on behalf of certain

Austrian funds.  Defendants appear to concede, however, that Raiffeisen is the management

company for its funds, challenging only its failure to produce certain contracts that might limit its

authority and its ability to satisfy the *Huff* rule.  (Def. Br. Individual Pl. at 30; Def. Reply Br.

Individual Pl. at 14.)  The Court concludes that because Raiffeisen is authorized to sue as a

matter of law, the failure to produce these contracts is immaterial to standing, and that because

Raiffeisen qualifies under the *Huff* exception, its failure to satisfy the *Huff* rule is irrelevant.

Raiffeisen therefore has standing to bring its claims.  AGF received assignments from four

Austrian funds and defendants do not challenge the standing of its assignors.


*The Danish Funds*

The Danish investment vehicles at issue are referred to as "Danish Investment

Associations" or "Special-Purpose Associations" ("Associations").  (Rostock-Jensen Decl. ¶

1.2.)  Each Association is governed by a board of directors elected by the Association's

members.  (*Id.* ¶ 3.1.)  The board of directors has authority to "leave the day-to-day management

to an investment management company approved by the Danish FSA" that "solely carries out

management, investment or marketing activities, and does so solely on behalf of the relevant

associations." (*Id.* ¶¶ 3.2, 3.3.) An Association is "an autonomous legal entity" that "can be a party to a lawsuit regarding the activities of the Association." (*Id.* ¶ 4.1.) While Danish law is clear that members of an Association cannot bring suit, (*id.* ¶ 4.3), it is less clear whether investment management companies can do so by operation of law (*id.* ¶ 5.1). It is possible, if not likely, that Danish law would include in the definition of "day-to-day management" the prosecution of lawsuits on behalf of the Association. (*Id.* ¶ 5.2.) However, the powers of investment management companies are to some extent limited, including a lack of authority to enter contracts on behalf of the Association and potentially the power to sign for the Association more generally. (*Id.* ¶¶ 5.4-5.5.)

The Court concludes that the relationship between investment management companies and Danish Associations is not the kind of special relationship that falls under the *Huff* exception. While plaintiffs' legal expert has made a case for the authority of investment management companies to bring suit against third parties, he has not made the case for why the Associations themselves face a barrier to bringing suit. Associations are legal entities with title to their assets, and plaintiffs have provided nothing to suggest that the board of directors could not bring suit in the Association's name. Moreover, considering that the board appoints the investment management company, the Court assumes that it could also fire the company. Indeed, the relationship seems more akin to that of a pension fund and its investment manager, i.e., not the sufficiently close relationship courts have found to satisfy the *Huff* exception.

Accordingly, the Court concludes that Danish investment companies Danske and Nordea Invest do not fall within the *Huff* exception and therefore do not have standing to bring suit. The Court acknowledges that, practically speaking, the difference between Danske and Nordea Invest bringing suit is negligible in light of the fact that their boards and the boards of the Associations

they represent consist of the same people.  (Individual Pl. Sur-Reply at 11.)  This, however, is an argument best left for substitution or assignment/ratification, and the Court addresses those arguments below.

## II.    Assignments and Substitution

In some instances, plaintiffs have received assignments or ratifications of their actions by entities the Court has concluded have standing to bring suit.  Other plaintiffs, most prominently GAMCO, request leave to obtain assignments from the proper parties or to substitute these proper parties as the "real parties in interest" under Rule 17 of the Federal Rules of Civil Procedure.  Defendants respond that a plaintiff "must have had standing at the time an action was brought" and consequently "only assignments made prior to the commencement of this suit can possibly establish that Individual Plaintiffs have standing to sue."  (Def. Reply Br. Individual Pl. at 15.)  Defendants similarly argue that substitution under Rule 17 cannot cure a standing defect and that all plaintiffs so requesting should be dismissed.  (*Id*. at 16-17.)

In *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11 (2d Cir. 1997), a case frequently cited by defendants, the Court of Appeals confronted a claim for securities fraud under Rule 10b-5 brought by a corporation against defendant traders for depressing the corporation's stock.  The suit was brought partly for the corporation's own losses and partly on behalf of other stockholders who assigned their claims to the corporation.  The district court found that the assignments, however, were defective and dismissed those claims brought by plaintiff on behalf of the shareholders for lack of standing.  The district court also refused to permit amendment of plaintiff's complaint to add the shareholders as parties because the

amendment would not relate back and shareholders' claims were barred by the statute of limitations.

The Court of Appeals affirmed the district court's decision with respect to the assignments, but reversed on the denial of leave to amend.  The court held that plaintiff's request "to make the selling shareholders the named plaintiffs on their own claims should have been considered in light of FRCP 17 and the amendment should have been found to relate back pursuant to Rule 17(a)."  Rule 17(a) provides:

> (1) Designation in General.
>     An action must be prosecuted in the name of the real party in interest.
> . . .
> (3) Joinder of the Real Party in Interest.
>     The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

The Court of Appeals reasoned that although "defendants' challenge to the original complaint was styled a motion to dismiss for lack of standing, their unspoken premise was that [plaintiff] lacked standing because the selling shareholders remained, with respect to their own claims, the real parties in interest."  *Id*. at 20.  Accordingly, the Court treated the motion to amend the complaint as a motion under Rule 17.  Given the Rule's proscription that after "ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest", it would be directly contrary to the Rule to bar relation back of such ratification, joinder or substitution.  *Id*.  Indeed, the Advisory Committee Notes to Rule 15, commenting on relation back, note that "To avoid forfeitures of just claims, . . . Rule 17(a) . . . provide[s] that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed for correction of the defect . . .

." *Id*. Where the real parties in interest were absent due to mere error and the defendants were sufficiently on notice of the claims, "it would be unjust to allow defendants to foreclose pursuit of those claims by taking advantage of that otherwise inconsequential error." *Id*. at 21.

*Advanced Magnetics* stands for the proposition that a standing defect at the commencement of suit does not require dismissal of the action with prejudice. Should the real parties in interest, i.e., the persons or entities that had standing to bring plaintiff's claims at the commencement of the suit, wish to ratify plaintiffs' actions, join the lawsuit, or substitute for the current plaintiffs, the court should allow those parties a reasonable time to do so. The Seventh Circuit case defendants cite is not to the contrary. In *Perry v. Village of Arlington Heights*, 186 F.3d 826 (7th Cir. 1999), the plaintiff challenged the constitutionality of certain portions of the Illinois Motor Vehicle Code and other sections of the Arlington Heights Municipal Code that authorized the seizure and disposal of abandoned vehicles. To satisfy the injury-in-fact requirement of standing, plaintiff alleged in his amended complaint that he "was a resident of Illinois", "had at least one automobile at his disposal", and "needed and desired to park an automobile within the state of Illinois and Arlington Heights". *Id*. at 828. During his deposition, however, plaintiff could not recall having any vehicles at his disposal at the time he filed the complaint. The court found that

> It is apparent from his deposition testimony that Perry believed that by subsequently establishing residency in Arlington Heights through the rental of an apartment and by obtaining title to an automobile, he no longer needed to rely on the allegations made in his amended complaint to satisfy the requirements of standing. Perry readily admitted in his deposition that he rented an apartment in Arlington Heights and obtained title to an automobile solely to establish standing. However, Perry did not rent this apartment or obtain title to the automobile until after he filed his complaint in this case.

*Id*. at 830.

The court concluded that plaintiff did not have standing at the commencement of his lawsuit and therefore that the district court properly dismissed his claim.  Of course, what was absent at the commencement of plaintiff's lawsuit was *any injury at all*.  It was purely speculative to assume that other people had been injured by the challenged code provisions at the time of commencement, and it was surely not part of plaintiff's claim.  The Seventh Circuit merely held that plaintiff could not attempt to incur an injury "as the case progresses."  *Id*.  Like the Court of Appeals in *Advanced Magnetics*, however, the Seventh Circuit refused to dismiss with prejudice.  It approved the district court's decision to postpone summary judgment as well as its invitation to plaintiff to file a second amended complaint that included allegations of events that happened subsequent to filing that would satisfy the injury-in-fact requirement.  *Id*. ("We also find no abuse of discretion in the district court's decision to postpone ruling on [plaintiff's] motion for summary judgment and to grant defendant's request to depose [plaintiff]. . . . If [plaintiff] wants to present new facts to the district court, Rule 15(c) of the Federal Rules of Civil Procedure provides the proper mechanism by which a party may supplement a pleading with transactions, occurrences or events which have transpired since the date of the pleading sought to be supplemented.").

Defendants argue that the Court should ignore this precedent and follow the opinion in *Berger v. Weinstein*, No. 07-994, 2008 WL 3183404 (E.D. Pa. Aug. 6, 2008).  In that case, the court granted summary judgment against plaintiff for lack of standing even after he had received an assignment of his claim post-filing of the complaint.  The court held in a footnote that "an assignment of legal rights which takes place after the commencement of litigation does not abdicate the constitutional requirement that standing 'must exist from the commencement of litigation.'"  *Id*. at *3 n.4 (citing *Friends of the Earth, Inc. v. Lainlaw Envtl. Servs. (TOC), Inc.*,

528 U.S. 167 (2000)).  *Friends of the Earth*, however, does not stand for the proposition that summary judgment should be granted against a plaintiff seeking compensation for a private injury.  *Friends of the Earth* involved a citizen-suit under the Clean Water Act.  In that case, the Supreme Court held that plaintiff's suit was not *moot* despite defendant's attempts to comply with the act because defendant's conduct might be "capable of repetition but evading review." In its discussion of mootness, the Court mentions that "the doctrine of mootness can be described as 'the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'"  *Id.*  Because the issue for mootness was whether there was any continuing injury or threat of continuing injury to anyone, the Supreme Court was apparently commenting on the necessity that *some injury* exist at the commencement of the litigation.  This would make sense considering that unlike a private action for compensatory damages where the existence of an injury is obvious from the claim, whether someone has suffered an injury in a public law litigation is a non-trivial question because the alleged dispute frequently concerns issues of policy rather than personal injury.

A further problem with *Berger* is its potentially unjust and inefficient result.  In fact, the plaintiff initially appealed the decision, realized how long an appeal would take and tried to stay it.  *Berger v. Weinstein (Berger II)*, 2008 WL 4858318, at *1 (E.D. Pa. 2008).  The Court of Appeals denied the stay, and plaintiff re-filed, this time with the assignment at commencement of the suit.  *Id.*  The district court then stayed the action while the appeal was pending.  *Id.* at *4.  In contrast, the court in *Northstar Financial Advisors, Inc. v. Schwab Investments*, 2009 WL 415616 (N.D. Cal. Feb. 19, 2009), held that an investment advisor did not have standing under *Huff* to bring suit on behalf of its clients without an assignment, but nevertheless, found that

while "the complaint does not allege that [plaintiff] has suffered an injury in fact sufficient to confer constitutional standing", plaintiff "could amend the complaint to cure these deficiencies." *Id*. at *2.  Instead of dismissing with prejudice the *Northstar* court dismissed without prejudice and granted leave to amend the complaint.

The Court concludes that the real parties in interest should be allowed a reasonable time to ratify plaintiffs' lawsuit, join the action, or substitute for plaintiffs.  The Court further concludes that those plaintiffs who have assigned their claims already have ratified plaintiff's action, but amendment of the complaint is necessary in any event.  Accordingly, the Court will grant defendants' motion for summary judgment against plaintiffs who sought or still need assignments or ratifications from the real parties in interest, but delay entry of judgment to give plaintiffs time to amend.  Amendments will relate back to the original filing of the complaints.

## CONCLUSION

For the reasons stated, the Court DENIES defendants' motion for summary judgment [647] for the following plaintiffs and their funds, as to which the court has held that there are genuine issues of material fact concerning whether plaintiffs were management companies during the class period for German funds, Luxembourgian FCPs, French FCPs, Belgian FCPs, Swedish funds, and Austrian funds:

AGF, AGI Kap, Bayern, BWI, Cominvest, DeAM, Deka Fundmaster, Deka Investment, Deka Ireland, Deka Lux, FT, FT-Lux, Helaba, Inka, KBC, LBB-Invest, MEAG KAG, Nordcon, OPAM, Oppenheim, PIKAG, Raiffeisen, SEB AB, Universal, and WestLB

For plaintiffs and funds not in this category, the Court GRANTS defendants' motions [647] & [643]. Plaintiffs are directed to move to amend their complaints within the next 30 days should they wish to allege assignment, ratification, or substitution by those entities with standing to bring suit. Plaintiffs moving to amend are directed to submit or resubmit proof of assignment, ratification, or substitution for each of the funds on whose behalf they bring suit. The Clerk of the Court is directed not to enter judgment against these plaintiffs for 45 days to allow them to file their motions and to allow the Court to decide such motions should they be filed.

SO ORDERED.

Dated: New York, New York
March 31, 2009

Richard J. Holwell
United States District Judge

25